1  Elizabeth H. Potter (WSB # 44988)
   Lauren M. Rule (OSB #015174) *pro hac vice pending*
2  ADVOCATES FOR THE WEST
   3701 SE Milwaukie Ave. Ste. B
3  Portland, OR 97202
   (503) 914-6388
4  epotter@advocateswest.org
   lrule@advocateswest.org
5
   *Attorneys for Plaintiffs*
6
                    **UNITED STATES DISTRICT COURT**
7                   **EASTERN DISTRICT OF WASHINGTON**

8  WILDEARTH GUARDIANS, and              No. 2:20-cv-440
   WESTERN WATERSHEDS
9  PROJECT,                              **COMPLAINT FOR**
                                         **DECLARATORY AND**
10      Plaintiffs,                      **INJUNCTIVE RELIEF**

11 v.

12 KRISTIN BAIL, Okanogan-
   Wenatchee National Forest, Forest
13 Supervisor, and U.S. FOREST
   SERVICE,
14
        Defendants.
15

16

17

18

19

20

**INTRODUCTION**

1.     Plaintiffs WildEarth Guardians and Western Watersheds Project challenge Defendant U.S. Forest Service's authorization of domestic sheep grazing on seven allotments within the Okanogan-Wenatchee National Forest (collectively "the Wenatchee Allotments").  Grazing on these allotments poses a high risk that domestic sheep will come into contact with and transmit disease to bighorn sheep, which can happen quickly and lead to die-offs of bighorn sheep herds.  This happened when a bighorn herd near Yakima was extirpated in 2013, shortly after domestic sheep strayed from the Wenatchee Allotments.  This fall, concerns about more disease outbreaks arose after a bighorn sheep in the Cleman Mountain herd tested positive for the disease-causing bacteria and a stray domestic sheep was found wandering with bighorn sheep from the Quilomene herd.  As a result, the Washington Department of Fish and Wildlife (WDFW) killed a dozen bighorn sheep to prevent the potential spread of disease and is monitoring the herds for additional evidence of an outbreak.

2.     The Forest Service is well aware of these problems, and in 2016, completed a scientific analysis that concluded domestic sheep grazing on the Wenatchee Allotments poses a high risk to four herds that include about two-thirds of all bighorn sheep within the National Forest and nearly fifty percent of all

bighorn sheep in Washington state.  In other states, federal agencies have ceased authorizing grazing that posed such a serious threat to bighorn populations.

3.      The Okanogan-Wenatchee National Forest has long recognized that under the National Forest Management Act (NFMA)—which requires the agency to protect viable populations of sensitive species like bighorn sheep—it must reduce the risks of disease transmission from domestic sheep grazing on the Wenatchee Allotments.  Nearly a decade ago, the agency proposed new management standards to ensure separation of these species but has failed to implement those standards on the Wenatchee Allotments.  Under the Forest Service's current schedule, it will likely be many more years before the agency even considers whether to adopt and implement such standards for the allotments.

4.      In the meantime, the Forest Service continues to issue annual authorizations that allow thousands of domestic sheep to graze on the high-risk Wenatchee Allotments each summer, even though it has the legal authority and duty to protect bighorn sheep now.  The Wenatchee Forest Plan requires the agency to prevent livestock from introducing disease to bighorn sheep, and the grazing permit for the allotments can be cancelled *at any time* for resource concerns like this.  By allowing domestic sheep to pose such a serious threat of disease transmission to bighorn sheep, the Forest Service is violating its duties under NFMA and other federal laws.  Plaintiffs seek declaratory and injunctive

relief to prevent such continued violations of law that threaten irreversible harm to the viability of this iconic species across the National Forest and within the state.

## JURISDICTION AND VENUE

5.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*.; NEPA, 42 U.S.C. § 4321 *et seq*.; NFMA, 16 U.S.C. § 1600 *et seq*.; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; and the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2214 *et seq*.  An actual, justiciable controversy exists between Plaintiffs and Defendants, and the requested relief is proper under 5 U.S.C. §§ 701–06 and 28 U.S.C. §§ 2201–02.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the public lands and resources in question are located in this district.

7.    The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

8.    Plaintiff WILDEARTH GUARDIANS is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West.  Guardians has over 188,000 members and

1   supporters, many of whom have particular interests in bighorn sheep.

2   Headquartered in Santa Fe, New Mexico, Guardians maintains several other

3   offices around the West, including in Washington state.

4       9.    Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit

5   membership organization headquartered in Hailey, Idaho with over 12,000

6   members and supporters, which is dedicated to protecting and conserving the

7   public lands and natural resources of watersheds in the American West.  WWP, as

8   an organization and on behalf of its members, is concerned with and active in

9   seeking to protect and improve the wildlife, riparian areas, water quality, fisheries,

10  and other natural resources and ecological values of watersheds throughout the

11  West, and in Washington state.

12      10.    Plaintiffs, and their staff and members, have deep and long-standing

13  interests in the preservation and protection of California bighorn sheep that are

14  directly harmed by Defendants' actions challenged herein.  Plaintiffs' staff and

15  members use and enjoy the public lands in and around the Okanogan-Wenatchee

16  National Forest, including the area at issue in this case, in order to observe,

17  photograph, study, and enjoy bighorn sheep and other native species.  Plaintiffs

18  and their members derive recreational, scientific, aesthetic, spiritual, and

19  commercial benefits from the existence in the wild of bighorn sheep through

20  observation, study, photography, and other pursuits.  Plaintiffs, and their staff and

COMPLAINT – 4

members will continue to use public lands in and around the Okanogan-Wenatchee National Forest in 2020 and beyond for these purposes, and their enjoyment will be reduced if the bighorn sheep populations in that area are extirpated or remain at low numbers due to disease.

11.    Plaintiffs have been long-time advocates for bighorn sheep in the West and have long-standing concerns about the threat to bighorn populations from domestic sheep grazing on public lands.  Plaintiffs have engaged in public outreach and education, advocacy with agencies, agency administrative processes, and litigation to promote the protection of bighorn sheep from domestic sheep grazing on public lands.  Plaintiffs have engaged with the Forest Service over the domestic sheep grazing allotments on the Okanogan-Wenatchee National Forest, expressing concerns about domestic sheep grazing on these allotments due to their high risk to the several bighorn populations in the area.  The Forest Service's failure to evaluate and disclose these risks through a supplemental NEPA analysis for the Wenatchee Allotments has deprived Plaintiffs of information and an opportunity to participate in a public NEPA process.  In turn, this has prevented Plaintiffs from fulfilling their missions and protecting their interests, which are described above.

12.    Plaintiffs' interests in protecting and enjoying bighorn sheep on the Okanogan-Wenatchee National Forest are being directly harmed by Defendants' action.  Plaintiffs' above-described interests have been, are being, and unless the

relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendants' violations of law.

13.    Defendant KRISTIN BAIL is sued solely in her official capacity as the Forest Supervisor of the Okanogan-Wenatchee National Forest.  The Forest Supervisor is one of the officials legally responsible for administering NEPA and NFMA and has delegated authority for carrying out the Forest Service's responsibilities under those statutes.

14.    Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States and is charged with managing the public lands and resources of the Okanogan-Wenatchee National Forest in accordance and compliance with federal laws and regulations.

## LEGAL BACKGROUND

**National Environmental Policy Act**

15.    NEPA requires federal agencies to undertake a thorough and public analysis of the environmental consequences of a proposed federal action by taking a "hard look" at the action's consequences.  The statute's twin objectives are to (1) ensure that agencies consider every significant aspect of the environmental impact of a proposed action, and (2) guarantee that relevant information is available to the public to promote well-informed public participation.

16.     To accomplish NEPA's purpose, Federal agencies must prepare a detailed environmental impact statement (EIS) for all major Federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C)(i).  Environmental information must be available to public officials and citizens before decisions are made and before actions are taken.  40 C.F.R. § 1500.1(b).[1]  An agency may prepare an environmental assessment (EA) to assist them in determining whether an action may have significant effects that require preparation of an EIS.  *Id.* § 1508.9.

17.     Even after an agency has completed an EIS or an EA, NEPA requires it to prepare a new or supplemental analysis where significant new information relevant to environmental concerns and bearing on the proposed action or its impacts arises.  40 C.F.R. § 1502.9(c)(1)(ii).[2]

_____

[1] Recent revisions to NEPA's regulations should not apply to the NEPA claims at issue in this complaint because the EIS process at issue began prior to their September 14, 2020 effective date.  85 Fed. Reg. 43304, 43339 (July 16, 2020).  This Complaint cites to the 1978 regulations that were in effect when that process began.  *See* 84 Fed. Reg. 22432 (May 17, 2019) (announcing NEPA process).

[2] The new NEPA regulations do not meaningfully change this standard.  See 40 C.F.R. § 1502.9(d)(1).

COMPLAINT – 7

**National Forest Management Act**

18.    NFMA governs the Forest Service's management of the National Forests.  16 U.S.C. § 1600 *et seq*.  The statute established a two-step process for forest planning. First, the Forest Service must develop, maintain, and revise Land and Resource Management Plans ("Forest Plans") for each national forest. *Id.* § 1604(a).  The Forest Plan guides natural resource management activities forest-wide, setting desired conditions, objectives, and standards and guidelines for various forest resources, including wildlife.  Forest Plans must provide for a "diversity of plant and animal communities." *Id.* § 1604(g)(3)(B).

19.    Once a Forest Plan is in place, site-specific actions are planned and evaluated by the Forest Service.  All site-specific decisions must be consistent with the broader Forest Plan.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

20.    The Wenatchee National Forest Plan was adopted in 1990[3] under the Forest Service's 1982 regulations implementing NFMA.  These regulations implemented NFMA's wildlife diversity provision by requiring that:

Fish and wildlife habitat shall be managed to maintain viable populations of

---

[3] Subsequently, the Okanogan and Wenatchee National Forests were administratively combined into a single National Forest but are still governed by separate Forest Plans issued before the merger.  The Wenatchee Allotments are governed by the Wenatchee National Forest Plan.

existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19 (1982).

21.    The Wenatchee National Forest Plan contains direction for implementing these requirements and sets overall objectives that include maintaining and improving wildlife habitat.

22.    The Forest Plan directs the agency to maintain viable populations and distribution of suitable habitat for sensitive species for which viability is a concern due to downward trends in population numbers or density or habitat capability.  It also describes a desired future condition for the Forest as one where the agency reduces activities that threaten sensitive species.  The Forest Plan directs the Forest Service to evaluate the impact that activities may have on sensitive species, and recommend mitigation requirements, in conjunction with WDFW.

23.    The Forest Service has identified bighorn sheep as a sensitive species.

24.    The Forest Plan provides specific direction to protect bighorn sheep from the grave risks of disease transmission from domestic sheep.  It directs the Forest Service to prevent introduction of disease from livestock into bighorn sheep

1  herds by identifying potential problem areas and developing a plan to mitigate the

2  identified problems.

3         25.    The Forest Plan also directs the agency to cooperate and coordinate

4  with WDFW in the relocation of animals to areas where wildlife habitat is

5  underutilized.

6         26.    The Forest Service manages livestock grazing on an allotment by

7  issuing a grazing permit; an Allotment Management Plan (AMP); and an annual

8  operating plan or instruction (AOI).  *Or. Natural Desert Ass'n ("ONDA") v.U.S.*

9  *Forest Serv.,* 465 F.3d 977, 979 (9th Cir. 2006).  Each of these is a site- specific

10 action which must be consistent with the Forest Plan.  *Buckingham v. Sec'y of U.S.*

11 *Dept. of Ag.,*603 F.3d 1073, 1077 (9th Cir. 2010).

12        27.    An AMP is a planning document that prescribes the manner in, and

13 extent to which, grazing operations will be conducted in order to meet multiple-use

14 and other goals and objectives.  36 C.F.R. § 222.2.

15        28.    Prior to each grazing season, the Forest Service issues an AOI with

16 instructions for the permittee that responds to new developments or resource

17 conditions, such as wildfire, drought conditions, water quality issues, compliance

18 problems, or sensitive species concerns.  AOIs are "final agency actions" that may

19 be challenged under the APA.  *ONDA v. U.S. Forest Serv.*, 465 F.3d at 979.

20

1

**STATEMENT OF FACTS**

2

**Domestic Sheep Transmit Disease to Bighorn Sheep.**

3      29.    No dispute exists among scientists and wildlife biologists that

4   domestic sheep can transmit pathogens to bighorn sheep that lead to pneumonic

5   die-offs within bighorn populations.  Domestic sheep are immune to these

6   pathogens but bighorns have not developed an immunity yet because they are a

7   newer species evolutionarily.  Die-offs occur when a pathogen is transmitted from

8   a domestic sheep to a bighorn sheep, and then that bighorn transmits it to other

9   members of the same herd.  Many bighorn die-offs from pneumonia reduce herd

10  sizes by 75–100%.

11     30.    Domestic sheep can carry multiple strains of pathogens.  A bighorn

12  herd that survives a die-off from one strain of a pathogen can experience another

13  die-off if it is exposed to a different strain of a pathogen.

14     31.    Female bighorns that are exposed to the disease but do not die

15  transmit the disease to their lambs during pregnancy, and the lambs die within

16  months of birth.  Herds that have experienced die-offs often have low lamb

17  recruitment for years following the disease outbreak.  This keeps populations at

18  low numbers, which makes them susceptible to extirpation from stochastic events

19  or further disease impacts.

20

COMPLAINT – 11

32.     Scientists thought that transmission of a pathogen from domestics to bighorns required direct physical contact between the species, but recent research indicates that pathogens can be transmitted through the air.

33.     The risk of contact between these species is high when they are using the same range because they are related—within the same genus—and both species are gregarious.  Therefore, they seek each other out when in the same vicinity.

34.     Although bighorn populations have home ranges where they spend most of their time, individual rams and ewes make forays outside of their home ranges when looking for mates or seeking out new or additional habitat.  Forays can occur miles away from the home range, with some bighorns traveling 20 miles or more.  In particular, young rams will make forays during the rut in the fall to look for mates.

35.     Where a bighorn herd has a home range that is within foray distance of another bighorn herd, interactions between the herds can be common.  An individual bighorn that forays into the home range of another herd can benefit both herds through genetic exchange and resulting genetic diversity.  However, these forays allow for disease to spread from one herd to another.

36.     The ranges used by both bighorn sheep and domestic sheep are generally steep and rugged.  Due to this topography, it is often very difficult to spot bighorn sheep on the landscape, and likewise difficult to find stray domestic sheep.

Most pneumonia disease outbreaks in bighorns have occurred without observing the actual contact between domestic and bighorn sheep.

37.    It is common for domestic sheep to stray from their band while on an allotment, and they can remain on their own for weeks or months at a time.  Stray domestic sheep have been documented miles away from their band or remaining on an allotment several months after the rest of the band had been removed. Domestic sheep can also stray from their band when they are trailing to or from an allotment.  The presence of predators—such as wolves or cougars—can also cause domestic sheep to scatter and stray.

38.    Because of the difficulty seeing and tracking individual bighorn sheep and domestic sheep in steep and rugged terrain, and the likelihood that these species will seek each other out if they are using the same range, bighorn experts agree that best management practices such as using extra herders and dogs, and notifying agency personnel when a bighorn is seen near domestic sheep, are not sufficient to prevent contact.

39.    Furthermore, if a bighorn is known to have made contact with a domestic sheep, it is not always possible to capture and remove the bighorn to prevent the spread of disease to the rest of the herd.  For instance, several years ago Idaho Department of Fish and Game (IDFG) made three attempts to capture and

1    remove a bighorn that was suspected of contacting domestic sheep but failed all

2    three times.

3         40.    Thus, the only way to prevent disease transmission is to keep the two

4    species physically separated by long distances.

5    **The Federal Government Has Repeatedly Closed Domestic Sheep
     Allotments to Protect Bighorn Sheep.**

6

7         41.    Due to the danger that domestic sheep pose to bighorn sheep,

8    numerous Forest Service allotments have been closed to protect nearby bighorn

     sheep populations, often as a result of court litigation.  After several groups filed a
9
     lawsuit in Idaho in 2007, the Forest Service closed domestic sheep allotments in
10
     Hells Canyon and along the Salmon River in Idaho because of the threat they
11
     posed to bighorn sheep populations.  When the livestock permittees challenged
12
     some of the closures, the U.S. District Court for the District of Idaho upheld the
13
     closures, finding that the decisions were well-supported by the science and bighorn
14
     sheep experts.  *W. Watersheds Project v. U.S. Forest Serv.*, 2007 WL 1729734,
15
     No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007); *W. Watersheds Project v. U.S.*
16
     *Forest Serv.*, 2007 WL 3407679, No. 4:07-cv-151-BLW (D. Idaho, Nov. 13,
17
     2007).
18
          42.    After doing an in-depth analysis about the risk of disease transmission
19
     to bighorn sheep, the agency closed more allotments on the Payette National Forest
20
     in Idaho that were determined to present a very high, high, or moderate risk to

COMPLAINT – 14

bighorn sheep.   The Forest Service relied on a "risk of contact" model that it developed to analyze the risk of the two species coming into contact based on habitat, the location of bighorn home ranges, and the potential for bighorn sheep forays onto allotments.   The livestock industry challenged the Payette National Forest's analysis and decision but the U.S. District Court for the District of Idaho and the Ninth Circuit Court of Appeals both upheld them. *Idaho Wool Growers Ass'n. v. Vilsack et al.,* 7 F. Supp. 3d 1085 (D. Idaho 2014), *aff'd* 816 F.3d 1095 (9th Cir. 2016).

43.    Subsequently, the Forest Service adopted the Payette National Forest's risk of contact model as its standard for addressing conflicts between bighorn and domestic sheep on national forests across the West.  The Bureau of Land Management (BLM) has also adopted the model for similar uses on lands under its jurisdiction.  For these and other reasons, the risk of contact model now represents the best available science for assessing the risk that federal allotments pose to bighorn sheep herds.

44.    In 2017, the Plaintiffs here brought another lawsuit over two Forest Service allotments in southeast Idaho that the agency's risk of contact model had shown were very high risk to bighorn sheep because of their proximity to the South Beaverhead Mountains bighorn population.  After a court injunction temporarily closed the allotments, the Forest Service extended that closure and it remains in

1    effect.  *W. Watersheds Project v. U.S. Forest Serv.*, No. 1:17-cv-434-CWD, 2017

2    WL 5571574 (D. Idaho Nov. 20, 2017).

3        45.    BLM in Idaho has also closed grazing allotments to domestic sheep

4    due to threats to bighorn sheep populations.  Initially, BLM refused to close an

5    allotment that was adjacent to some of the high-risk allotments on the Payette

6    National Forest.  A court injunction in 2009 temporarily closed the allotment, and

7    BLM extended that closure while it conducted a thorough analysis.  *W. Watersheds*

8    *Project v. BLM*, No. 4:09-cv-507-BLW, 2009 WL 3335365 (D. Idaho, Oct. 14,

9    2009).  The agency finished its analysis in 2017, which resulted in the permanent

10   closure of that allotment and two others that BLM determined were high or

11   moderate risk to bighorn sheep in central Idaho.

12       46.    BLM has also closed three allotments in southeast Idaho near bighorn

13   sheep populations, one in 2012 and two more in 2018, while it conducts an

14   analysis of long-term management options.

15       47.    Federal grazing allotments in other states around the West have

16   likewise been closed to domestic sheep to protect bighorn populations.  Forest

17   Service allotments in California, Colorado, and Wyoming have been closed to

18   domestic sheep to protect bighorn sheep, either through Forest Service actions or

19   permittees voluntarily waiving their permits back to the agency (in exchange for

20

compensation).  These allotment closures have reduced the threat of disease for numerous bighorn sheep populations across the West.

**Bighorn Sheep within Washington and the Okanogan-Wenatchee National Forest.**

48.    Bighorn sheep are native to Washington state but were extirpated in the early 1900's due primarily to disease and over-harvest.  Animals have been re-introduced and now occupy only a fraction of their historic range in Washington state.  Nearly 1,700 bighorn sheep across sixteen herds in the state remain.

49.    The Washington Department of Fish and Wildlife (WDFW) has set statewide goals to preserve and protect bighorn sheep and to manage them for a variety of recreational, educational, and aesthetic purposes that include hunting, scientific study, cultural and ceremonial uses by Native American tribes, wildlife viewing, and photography.  WDFW's management plan for the species explained that the "overwhelming management concern" is mortality and poor lamb recruitment due to pneumonia.

50.    The Okanogan-Wenatchee National Forest provides some of the best remaining habitat in the state for the species.

51.    Nine of the sixteen herds in the state have core home ranges that overlap with or are within foray distance of the National Forest.  These herds make up roughly seventy-five percent of the state's total bighorn sheep population.

52.    Four of these herds—the Chelan Butte, Swakane, Umtanum, and Cleman Mountain herds—along with the former Tieton herd, have core home range that overlaps with or is in close proximity to the Wenatchee Allotments within the Okanogan-Wenatchee National Forest, as illustrated below:

53.    Collectively, these four herds represent roughly two-thirds of all bighorn sheep that inhabit the Okanogan-Wenatchee National Forest, and nearly half of all bighorn sheep within Washington state.

54.    Each of these four herds are within fifteen miles of another herd, putting them easily within foray distance of each other.  WDFW has documented several instances of bighorn forays from the core herd home range in the state.

55.    WDFW and others have noted that bighorn sheep herds and their core home ranges in this area may be shifting and expanding, as bighorn sheep have been spotted more often near the Wenatchee Allotments in recent years.

56.    A die-off within the Umtanum herd in 2009–2010 reduced the herd substantially, and low lamb recruitment continues to plague that herd to this day. It remains below the population objectives described in WDFW's Game Management Plan and is still considered infected.  Thus, future declines and poor recruitment from transmission of a new strain of pathogen would be devastating to this herd.

57.    Recent population estimates of the Swakane, Cleman, and Chelan herds generally fall within the population management objectives.  However, these objectives are set artificially low to minimize the risk of disease transmission.

58.    A fifth herd, the Tieton herd, occupied habitat that was adjacent to the Wenatchee Allotments until it suffered a severe outbreak of pneumonia in 2013,

which WDFW determined was caused by domestic sheep and led to the herd's extirpation.

59.    Bighorns from the nearby Cleman Mountain herd began moving into the range of the former Tieton herd, but given their proximity to domestic sheep on the Wenatchee Allotments, WDFW decided to lethally remove those bighorn sheep to prevent another disease event.

60.    WDFW set an objective in its Game Management Plan to reestablish a herd into the former range of the Tieton herd by 2016.  However, WDFW cannot achieve this objective until threats from domestic sheep grazing on the Wenatchee Allotments are abated.  WDFW has repeatedly connected its inability to reintroduce bighorn sheep to the "substantial" or "unacceptably high risk" of disease transmission from domestic sheep grazing on the Wenatchee Allotments.

61.    Other herds in the state have been infected with pneumonia and experienced die-offs.  The herds in the Hells Canyon area have declined since the 1990s due to pneumonia outbreaks and suffered from poor recruitment, but then rebounded once the agency closed nearby domestic sheep allotments on the Payette National Forest.

62.    The Asotin herd in southeastern Washington suffered an all-age die-off in 2012 and subsequently tested positive for bacteria that cause pneumonia.

63.    In May 2019, WDFW confirmed that a dead bighorn ram in the Mt. Hull herd at the northern edge of the Okanogan-Wenatchee National Forest tested positive for pneumonia and that other recent bighorn deaths in the area were suspicious.

64.    In October 2020, WDFW received reports of sick bighorn sheep in the Cleman Mountain herd, after which a dead lamb tested positive for the disease-causing bacteria.  WDFW announced it will closely monitor this herd for evidence of a disease outbreak in 2021.

**Domestic Sheep Grazing on the Okanogan-Wenatchee National Forest Threatens Bighorn Sheep Herds in Washington.**

65.    The Forest Service allows one company to graze thousands of domestic sheep on nine allotments within the Okanogan-Wenatchee National Forest each summer.  Seven of these allotments—Rattlesnake, Nile, Naches, Manastash, Eagle Blagg, Switchback, and Mosquito Ridge—overlap with, or are very near core herd home range for four bighorn herds.[4]

66.    For years, the Forest Service has known that domestic sheep grazing on these allotments poses a serious risk of disease transmission to bighorn sheep herds that inhabit the Wenatchee National Forest.

_____

[4] The Forest Service also authorizes the company to graze on the Swauk and Limekiln Allotments, which are not at issue in this lawsuit

COMPLAINT – 21

67.    In 2012, it assessed the viability of bighorn sheep populations across the Okanogan-Wenatchee National Forest and the Colville National Forest in northeast Washington, producing a draft viability assessment.  The assessment identified domestic sheep grazing as one of two major factors contributing to the decline of habitat capability—which it estimated to be at 57 percent of historical levels—and recommended reducing the risk of disease transmission between the species.

68.    In 2013, the Forest Service completed draft modeling that suggested there was a high risk of contact between species due to grazing on the Wenatchee Allotments.

69.    In 2016, the Forest Service quantitatively analyzed the risk that domestic sheep grazing on the Wenatchee Allotments poses to bighorn sheep.  The Forest Service relied on its "Risk of Contact" model that the agency and BLM use to assess the risk that a bighorn sheep will come into contact with a domestic sheep allotment.

70.    The Forest Service found that grazing on seven allotments carried a high risk of contact with four bighorn sheep herds: Swakane, Cleman Mountain, Umtanum, and Chelan Butte.  The agency also found a high risk of contact for any bighorn sheep that use the core herd home range of the now-extirpated Tieton herd.

COMPLAINT – 22

71.     Under the Risk of Contact model, a high risk means that domestic sheep grazing on an allotment is likely to result in more than .08 contacts per year with bighorn sheep, which can lead to a disease outbreak within fifty years. Longer disease-free intervals are needed to maintain population viability.

72.     As illustrated below, the Forest Service found that the risk of contact for seven of the Wenatchee Allotments was greater than its own 0.08 threshold for high risk allotments—often by a substantial amount:

| Risk of Contact estimates based on telemetry-derived core herd range | | | | | |
|---|---|---|---|---|---|
| Allotment | Chelan | Cleman | Swakane | (Former) Tieton | Umtanum |
| *Naches* | | Intersects | | 0.18 | 0.13 |
| *Nile* | | Intersects | | 0.12 | |
| *Eagle-Blagg* | | | 0.84 | | |
| *Rattlesnake* | | 0.68 | | 0.17 | |
| *Mosquito Ridge* | 0.11 | | 0.22 | | |
| *Manastash* | | 0.27 | | | |
| *Switchback* | | | 0.11 | | |

Source: Washington Conservation Science Institution, *Application of the Bighorn Sheep Risk of Contact Model on the Okanogan-Wenatchee National Forest: Final Report* (Feb. 2016).

73.     These bighorn herds that are at high risk of disease transmission have core home range within fifteen miles of at least one other herd—easily within bighorn foray distance.  Forays between these herds are more likely to occur because there is good habitat connectivity between their home ranges.  Thus, if one herd becomes infected, there is a high likelihood that disease will spread, infect

multiple herds, and cause catastrophic die-offs to a substantial number of bighorns in the National Forest and the state.

74.     WDFW has determined there is a substantial threat of disease transmission from domestic sheep grazing the Wenatchee Allotments to these four bighorn sheep herds plus any that re-inhabit the Tieton herd range.  WDFW has noted that the permittee's domestic sheep have tested positive for pathogens associated with disease and die offs in bighorns and has documented interactions between the permittee's domestic sheep and bighorn sheep.

75.     The Department has described the threat to the Cleman Mountain herd as particularly high due to the herd's use of areas near and within areas the Tieton herd used prior to its extirpation.

76.     WDFW has repeatedly informed the Forest Service of this threat and its concerns about continuing domestic sheep grazing on these allotments.  WDFW has stated that eliminating or reducing the risk of contact between domestic sheep and bighorn sheep is essential to the long-term viability and health of bighorns in the state.

77.     In 2016, WDFW sent the Forest Service a letter stating that reducing the risk to bighorn sheep from these allotments remains a "high priority" for the state and offering to assist with any data or analysis needs.

78.     The Yakama Nation has also expressed serious concerns about the high risk of disease transmission that domestic sheep grazing on the Forest poses to the bighorn sheep herds in the area.  In a letter dated May 2010, the Yakama Nation called for the Forest Service to immediately terminate domestic sheep grazing or move such grazing to allotments that are at least 35 miles from bighorn sheep habitat or foray areas to prevent contact.

79.     Despite the Risk of Contact results and concerns raised by other sovereigns, the agency issued AOIs that authorized thousands of domestic sheep to graze the Wenatchee Allotments in 2016, 2017, 2018, 2019, and 2020, and will issue one for 2021 absent court intervention.

80.     In recent years, the agency authorized a trial conversion from sheep to cattle on the Naches Allotment but has not made this conversion permanent.

81.     For the remaining allotments, the Forest Service has generally authorized fewer sheep to graze than the maximum numbers permitted but has refused to implement the only measure known to prevent disease transmission— separation of *all* domestic sheep from bighorn sheep by substantial distances.

**Conditions on and Management of the Wenatchee Allotments Increase the Risk of Contact Between Domestic and Bighorn Sheep.**

82.     The Forest Service's Risk of Contact model does not address the potential for domestic sheep to stray from their allotment—a common

occurrence—nor does it account for the natural attraction between the species, both of which create an even higher risk of disease transmission than the results suggest.

83.    Conditions on the Wenatchee Allotments and surrounding area increase the risk that domestic sheep will stray from their bands and interact with bighorn sheep.  The Forest Service's own monitoring photos show domestic sheep entering densely forested and steep areas where they can easily be lost, wander, and enter bighorn core home range or encounter foraying bighorns.

84.    Plaintiffs have also documented densely forested conditions that make it virtually impossible for herders to keep track of thousands of domestic sheep in this area.  During site visits to the Nile and Mosquito Ridge allotments during summer 2020, a representative for Plaintiff Western Watersheds Project documented such conditions and observed a domestic sheep herd with no herder in sight.

85.    The following photo, taken on the Nile Allotment in June 2020, illustrates thick vegetation and a rolling landscape that make it virtually impossible for a single herder to track.  Domestic sheep are the almost imperceptible white dots spread across the middle of the hillside.



86.    These conditions also make it impossible for the permittee to follow the Forest Service's "adaptive management" practices, which are supposed to re-route domestic sheep if bighorns are observed in the area.  The densely forested, steep, and rugged area makes it difficult for sheep herders, members of the public, or government employees to observe and report bighorn sheep on the allotments.

87.    The permittee has admitted to the Forest Service that domestic sheep have been unaccounted for at the end of a grazing season on occasion and has often reported discrepancies between the number of sheep it allows on at the beginning of a season with those it removes at the end of the season.

88.    After the grazing season in 2012, the permittee reported that dozens of stray domestic sheep across multiple allotments were not removed at the end of the

COMPLAINT – 27

season.  Many domestic sheep remained in the area after the date that sheep were

required to be off the allotments and the Forest.  Some of the domestic sheep were

never located.  Months later, in 2013, the Tieton herd—whose core home range

was located adjacent to the allotments—was extirpated due to pneumonia.

89.     Cougars and wolves—which are predators of domestic sheep—inhabit

the area and can cause sheep to run and scatter, further increasing the risks that

domestic sheep will stray from the allotments.  Similarly, predators can cause

bighorn sheep to scatter from their core herd home range or influence their forays,

which can further increase the risk of contact.

90.     The permittee has repeatedly identified predators as the cause of lost,

missing, or injured sheep during or after grazing seasons.  For example, in August

2018, several domestic sheep were reported dead, injured, or missing, and were

found in a remote drainage away from the main band.  Available evidence

indicates wolves attacked the domestic sheep, and telemetry data confirmed wolves

were in the vicinity on the day of the attack.

91.     Similar problems arose during the 2019 grazing season.  On the Nile

allotment, the permittee was late removing 619 ewes and reported that seven sheep

were unaccounted for at the end of the season.  Predators were also a problem,

killing or injuring 30 sheep on the Nile allotment, 19 on the Rattlesnake allotment,

10 on the Mosquito Ridge allotment, 5 on the Eagle-Blagg allotment, and 3 on the Manastash allotment.

92.    During 2020, several problems arose.  In May, the permittee found a bighorn sheep, likely from the Quilomene herd, mixed in with his domestic sheep band and killed the bighorn sheep as a result.

93.    Months later, in October, WDFW was notified that a domestic sheep—reportedly from the permittee's band—was found with seven bighorn sheep near the Quilomene Wildlife Area.  After killing and testing the domestic sheep, WDFW confirmed it carried disease-causing bacteria.  To determine whether the bacteria had spread to the nearby Quilomene herd—the state's largest—WDFW killed 12 bighorn sheep for testing.  Although the bighorn sheep tested negative for the bacteria, WDFW began systematic searches by helicopter and other means to watch for evidence of disease transmission to this herd.

94.    Despite these high risks and repeated problems—and resulting costs to the public—the Forest Service has conducted minimal monitoring of domestic sheep grazing on the allotments, or of bighorn sheep and the species' habitat. When the permittee self-reports missing or lost sheep at the end of the season, the agency has not documented follow-up investigations, confirmed that all sheep are accounted for, or determined whether domestic sheep strayed from the allotments into bighorn sheep core herd home range.

**The Forest Service's Delays in Taking Action to Protect Bighorn Sheep.**

95.    For nearly a decade, the Forest Service has recognized it must take action to address the conflict between bighorn sheep and domestic sheep grazing on the Wenatchee Allotments.  But the agency has repeatedly delayed doing so.

96.    The Forest Service last completed AMPs for these allotments in 2000 and 2004, which were analyzed under NEPA through two EAs completed in 1999 and 2004.  The EAs recognized the threat that disease transmission from domestic sheep poses to bighorn sheep but did not assess or determine that the risk of contact was high and did not adopt meaningful restrictions on grazing to protect bighorn sheep.

97.    By at least 2011, the Forest Service recognized that it needed to conduct a new analysis of domestic and bighorn sheep conflicts.  It has stated numerous times it would do so, but has delayed and deprioritized the work.

98.    In 2011, through the Federal Register, the Forest Service published a notice of intent to revise the Okanogan and Wenatchee Forest Plans and sought public comment on what alternative actions to evaluate in an environmental impact statement.   At this time, the Forest Service had already identified, based on public input and its own work, a "proposed action" that included specific direction for managing conflicts between domestic sheep and bighorn sheep that would

"provide temporal or spatial separation between bighorn sheep and domestic sheep to reduce the risk of potential disease spread."

99.    In 2013, the agency issued a summary of public comments on its "proposed action" to revise the Forest Plan.  The agency noted that "reviewers were concerned the proposed action didn't adequately deal with the risk of disease transmission from domestic sheep to bighorn sheep."  Such concerns were raised by the Washington Department of Natural Resources and WDFW; those departments explained that "separation between domestic species is required to ensure long-term viability and prevent the risk of disease transmission, such as complete geographical separation within the bighorn sheep herd range and/or a buffer between the areas where bighorn sheep are known to frequent the grazing allotments on NFS lands."

100.    In 2013, the Forest Service announced it would only issue one-year grazing permits until a new NEPA analysis that addressed bighorn sheep conflicts was complete.

101.    However, in 2014, without conducting *any* new NEPA analysis or making any new decisions, the Forest Service issued a new ten-year grazing permit that authorizes almost 7,000 domestic sheep to graze for approximately eight to ten

weeks between May and September on the seven Wenatchee Allotments.[5]  The

permit expressly allows the Forest Service to cancel the permit in whole or in part

at any time due to changes such as resource conditions.  It also states that the 2000

and 2004 AMPs covering the seven high-risk allotments are incorporated into the

permit, as well as the Wenatchee Forest Plan and each year's AOIs.  The permit

will not expire until December 31, 2023.

102.   Since issuing the new permit in 2014, the Forest Service has

authorized grazing through AOIs each spring.  These AOIs acknowledge bighorn

sheep conflicts but merely request that the permittees use best management

practices to avoid those conflicts "to the best of their ability."

103.   In May 2014, the Wenatchee Forest Supervisor informed WDFW that

it planned to delay new analyses of domestic sheep grazing and bighorn sheep

conflicts until after it completed a revision of the governing Forest Plan.

104.   In 2015, the Forest Service publicly announced that it had put on hold

its plans to revise the Okanogan-Wenatchee Forest Plans and informed WDFW

that any NEPA process had been delayed.

---

[5] The permit also covers the Limekiln and Swauk allotments that are not at issue in
this complaint.

COMPLAINT – 32

105.    Shortly after completing its risk of contact analysis in 2016, the Forest Service prepared talking points for a stakeholder meeting that stated "[t]he Risk of Contact modeling has clearly displayed the need for the Forest to update our domestic sheep grazing NEPA Forest-wide…."  At a meeting with the permittee and other agencies, a Forest Service representative made similar comments, explaining that the agency has "new info that must be used to supplement old NEPA" and that the agency "must consider new info about bighorn sheep" as the "[p]ossibility of an injunction appear high."

106.    In June 2016, the Forest Service announced it would begin a new NEPA process to address the domestic and bighorn sheep conflicts during the fall of that year.  The agency repeated this intention at a public meeting in Ellensburg in August 2016.  Subsequently, the Forest Service informed WDFW that staffing problems delayed the start of this process until 2017.

107.    In 2017, the Forest Service established a NEPA Interdisciplinary Team and began internal scoping efforts to support a new NEPA analysis.

108.    In April 2017, the Forest Supervisor informed the Eastern Washington Cascades Provincial Advisory Committee that despite the longstanding risk of disease transmission to bighorn sheep, the Forest Service had not made progress on how to manage the "situation" and how to prepare a new NEPA analysis.

COMPLAINT – 33

109.   By 2018, the Forest Service decided to break the process into two parts, first amending the Forest Plan to add direction for addressing conflicts between the species, and then subsequently conducting site-specific analysis for the allotments to implement management changes.  The Forest Service took some preliminary steps toward the Forest Plan amendment by entering into a work order for intra-agency assistance with the process.  At that time, the agency estimated release dates for the draft EIS in July 2019 and a Final EIS and decision in February 2020.  That year, the Forest Service also suggested in a letter that the Forest Plan amendment, when completed, will state that domestic sheep allotments will "not be permitted where a high risk of contact" with bighorn sheep exists based on an analysis done through the Risk of Contact model.

110.   On May 17, 2019, the Forest Service officially announced to the public—through a publication in the Federal Register—that it intended to prepare an EIS and an amendment to the Wenatchee Forest Plan to provide direction for addressing conflicts between domestic sheep grazing and bighorn sheep.  Through that notice, the agency requested comments from the public on the scope of the upcoming analysis.  The agency estimated it would publish a draft EIS during the winter 2020 and issue a Final EIS in summer 2020.

111.   The agency extended this timeline during the winter of 2020, indicating that it would release a draft Forest Plan and EIS and allow public comment in September 2020 and issue a final EIS and decision by summer 2021.

112.   In September 2020, the Forest Service sent a letter to Plaintiff WWP showing that the process was several months behind schedule.

113.   Just weeks later, in October 2020, the Forest Service announced that it was yet again delaying the process, stating that it now expects to release a draft Forest Plan and EIS and allow public comment in February 2021 and then issue a final EIS for the Forest Plan amendment in November 2021.

114.   The Forest Service has only provided estimated release dates for the first step of its process: an EIS for the proposed Forest Plan amendment.  It has not issued any estimated release dates—or even committed to completing—the second step of its process: a site-specific NEPA analysis and update to the AMPs or other grazing decisions for the Wenatchee Allotments.

115.   The Forest Service does not plan to make any actual changes to grazing management on the Wenatchee Allotments as a result of the forthcoming Forest Plan amendment.  Any delays in that Forest Plan process further delay site-specific NEPA analysis to update the AMPs and implement on-the-ground actions for the Wenatchee Allotments needed to create separation between the species.

Thus, the agency is likely to continue authorizing domestic sheep grazing on those allotments under the same terms and conditions as existing AOIs for many years.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF NATIONAL FOREST MANAGEMENT ACT**
(Inconsistency with Wenatchee Forest Plan)

116.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

117.   This first claim for relief challenges the Forest Service's violation of the National Forest Management Act, 16 U.S.C. § 1600 et seq., and NFMA's implementing regulations, in authorizing domestic sheep grazing on the high-risk Wenatchee Sheep Allotments.  Plaintiffs challenge the 2016–2020 AOIs, as well as the upcoming 2021 AOI, pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.[6]

118.   Under NFMA, the Forest Service must act consistently with direction in the applicable land management plan when authorizing any project or activity. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

119.   The Wenatchee Forest Plan requires the agency to:

---

[6] Plaintiffs challenge the AOIs issued by the Forest Service after the 2016 risk of contact analysis determined that these allotments pose a high risk to bighorn sheep.

     a. protect biodiversity and ensure viable populations of bighorn sheep exist throughout the National Forest;

     b. consider the impact its grazing decisions have on bighorn sheep, create a plan to mitigate these impacts, and prevent domestic sheep from introducing disease to bighorn sheep; and

     c. cooperate with WDFW in the relocation of wildlife to habitat that is underutilized.

120. The Forest Service has acted inconsistently with these directives from the Forest Plan by issuing AOIs that have authorized domestic sheep to graze on the Wenatchee Allotments each year from 2016 to 2020, and will again act inconsistently by issuing the 2021 AOI.

121. First, the agency's Risk of Contact Modeling and other data demonstrate that grazing on these allotments presents a high risk of contact and disease transmission between domestic sheep and four bighorn sheep herds: the Cleman Mountain, Chelan Butte, Swakane, and Umtanum herds. These herds constitute approximately two-thirds of all bighorn sheep that inhabit the Okanogan-Wenatchee National Forest. By allowing domestic sheep grazing on the Wenatchee Allotments to present a high and unacceptable risk of disease transmission to these bighorn sheep herds, the Forest Service is failing to ensure the viability of bighorn sheep across the National Forest.

122.    Second, the agency has failed to create a plan to mitigate the high risk of disease transmission by repeatedly delaying any site-specific analysis for the Wenatchee Allotments after recognizing the Risk of Contact model results showed the need for such a plan.  In similar situations, where the Forest Service determined a domestic sheep grazing allotment posed such a high risk, the agency has stopped grazing on the allotment because substantial physical separation of the species is the only way to ensure disease transmission does not occur.  By failing to do so here, the agency has failed to "prevent" domestic sheep from transmitting disease to bighorn sheep.

123.    Finally, domestic sheep grazing on the Wenatchee Allotments also poses a high risk of contact with any bighorn sheep that inhabit the former range of the Tieton herd.  WDFW has repeatedly cited this high risk from grazing on the National Forest as the major impediment to its goal of relocating bighorn sheep into this area.  By continuing to authorize grazing that prevents WDFW from relocating bighorn sheep to this area, the Forest Service is failing to cooperate with WDFW on relocating animals into this underutilized habitat.

124.    Accordingly, the Forest Service's 2016–2021 AOIs for the Wenatchee Sheep Allotments are arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA, and therefore are unlawful and must be set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT
(Failure to Complete Supplemental NEPA)

125.  Plaintiffs reallege and incorporate by reference all preceding paragraphs.

126.  The APA requires federal agencies to complete matters presented to them within a reasonable time, 5 U.S.C. § 555(b), and empowers federal courts "to compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

127.  NEPA requires the Forest Service to prepare an environmental impact statement for every major federal action that significantly affects the quality of the human environment.  43 U.S.C. § 4332(C).  The agency must also prepare a new or supplemental analysis where significant new information relevant to environmental concerns and bearing on a major federal action or its impacts arises.  40 C.F.R. § 1502.9(c)(1)(ii).

128.  By at least 2011, the Forest Service recognized the need to protect bighorn sheep from the threat of disease transmission from domestic sheep grazing on the Wenatchee Allotments.  After the Risk of Contact modeling showed seven allotments were high risk to bighorn sheep, the Forest Service identified the need to complete supplemental NEPA analysis for domestic sheep allotments on the

Forest.  This process would update the 2000 and 2004 AMPs, which continue to govern management of the seven allotments, to address conflicts between the species.

129.   For at least nine years, the Forest Service has repeatedly started and stopped its efforts, bifurcated the process into two steps, and continually postponed the site-specific analysis needed to implement actual changes in allotment management.  In early 2020—before the pandemic—the agency announced that it would yet again delay the Forest Plan revision and EIS by several months.  The agency has no estimate for when it will complete the second step of site-specific supplemental NEPA for the allotments to update the AMPs.

130.   Preparing a supplemental NEPA analysis to update the AMPs to address specific threats from domestic sheep grazing on the Wenatchee Allotments is discrete agency action which the Forest Service must take under NEPA.  The Forest Service has failed to complete this process at least nine years after it recognized the need to reduce the risk of contact between domestic sheep and bighorn sheep.

131.   The consequences of the Forest Service's delay have been significant. After dozens of domestic sheep strayed from the Wenatchee Allotments in 2012, the nearby Tieton herd experienced a disease outbreak that led to the herd's extirpation.  Since that time, domestic sheep have strayed from the allotments or

gone missing, contact between domestic and bighorn sheep has occurred, and

bighorn sheep in multiple herds have tested positive for the disease-causing

bacteria.  Yet the Forest Service has continued to authorize grazing on these

allotments under AOIs that implement the outdated 2000 and 2004 AMPs, despite

increasing awareness of the risks that domestic sheep pose to bighorn sheep.

132.   Plaintiffs are injured and substantially prejudiced by the Forest

Service's failure to complete a supplemental NEPA analysis to update the AMPs

for the Wenatchee Allotments and reduce the risk of disease transmission to

bighorn sheep, as required under NEPA.

133.   WHEREFORE, Plaintiffs pray for relief as set forth below.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT**
(Irreversible and irretrievable commitment of resources)

134.   Plaintiffs reallege and incorporate by reference the preceding

paragraphs.

135.   This third claim for relief challenges the Forest Service's violation of

the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and its

implementing regulations, in authorizing domestic sheep grazing on the Wenatchee

Sheep Allotments pursuant to the 2017–2021 AOIs.[7]  The AOIs are final agency

---

[7] Plaintiffs challenge the AOIs issued by the Forest Service after it started working

COMPLAINT – 41

action subject to judicial review under the APA, and Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

136.   NEPA regulations require an agency to conduct the necessary environmental analysis early in the planning process so that it can contribute to the decision-making process and is not used simply to rationalize or justify a decision already made.  40 C.F.R. §§ 1501.2, 1502.2(g), 1502.5.

137.   By 2016, the Forest Service recognized the need to complete supplemental NEPA analysis for the Wenatchee Allotments due to new information, including the Risk of Contact modeling that showed seven allotments are high risk to bighorn sheep.  It initiated a process to fulfill this requirement but has not even begun the second step of site-specific allotment analysis.

138.   Until it completes this process by updating the AMPs for the Wenatchee Allotments, the agency cannot take any action or make any commitment of resources that would have an adverse environmental impact or prejudice or limit the choice of reasonable alternatives.  *Id.*  §§ 1502.2(f), 1506.1(a).  In other words, an agency cannot make any irreversible or irretrievable commitment of resources before an environmental analysis is completed.

---

on a new and/or supplemental NEPA process to address the threat to bighorn sheep posed by grazing on the high-risk allotments.

139.    The Forest Service's Risk of Contact modeling, along with other information, demonstrates that domestic sheep grazing on the Wenatchee Allotments poses a high risk of contact with bighorn sheep.  Such contact would almost certainly lead to die-offs within one or more bighorn herds and poor lamb survival for years.  This presents an unacceptable risk of irreversible harm to four bighorn sheep herds in the area.  By authorizing grazing through the 2017–2021 AOIs, the Forest Service has made and continues to make an irreversible or irretrievable commitment of resources.

140.    Accordingly, the Forest Service's 2017–2021 AOIs for the Wenatchee Allotments are arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, and therefore are unlawful and must be set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Order, declare, and adjudge that the Forest Service's 2016–2021 AOIs for the Wenatchee Sheep Allotments are arbitrary, capricious, an abuse of discretion, and/or violated NEPA and/or NFMA, and thus are unlawful under the judicial review standards of the APA, 5 U.S.C. § 706(2)(A);

B.    Order, declare, and adjudge that the Forest Service has unlawfully withheld and/or unreasonably delayed fulfilling its nondiscretionary duty under NFMA and NEPA to complete supplemental environmental analysis and updated Allotment Managements Plans for the Wenatchee Allotments, in violation of the APA, 5 U.S.C. § 706(1);

C.    Vacate and set aside the 2016–2021 AOIs for the Wenatchee Sheep Allotments;

D.    Enjoin the Forest Service from authorizing domestic sheep grazing on the Wenatchee Allotments until the agency completes its NEPA analyses and complies with NFMA and the Wenatchee Forest Plan;

E.    Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

F.    Award Plaintiffs their reasonable attorney fees, costs, and litigation expenses under EAJA, and/or any other applicable provision of law; and

G.    Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of Plaintiffs, the public, wildlife, and the lands at issue.


Dated:        November 30, 2020        Respectfully submitted,

s/ Elizabeth H. Potter
Elizabeth H. Potter (WSB # 44988)

COMPLAINT – 44

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

s/ Lauren M. Rule
Lauren M. Rule (OSB #015174) *pro hac vice pending*

ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave. Ste. B
Portland, OR 97202
(503) 914-6388
epotter@advocateswest.org
lrule@advocateswest.org

*Attorneys for Plaintiffs*

COMPLAINT – 45