1  Elizabeth H. Potter (WSB #44988)
   Lauren M. Rule (OSB #015174) *pro hac vice*
2  ADVOCATES FOR THE WEST
   3701 SE Milwaukie Ave. Ste. B
3  Portland, OR 97202
   (503) 914-6388
4  epotter@advocateswest.org
   lrule@advocateswest.org
5
   *Attorneys for Plaintiffs*
6
             **UNITED STATES DISTRICT COURT**
7            **EASTERN DISTRICT OF WASHINGTON**

8  WILDEARTH GUARDIANS, and          No. 2:20-cv-00440-RMP
   WESTERN WATERSHEDS
9  PROJECT,                          **MOTION FOR PRELIMINARY
                                     INJUNCTION AND
10 Plaintiffs,                       MEMORANDUM IN SUPPORT**

11 v.                                NOTED FOR: April 5, 2021
                                     With Oral Argument at 10:00 am
12 KRISTIN BAIL, Okanogan-
   Wenatchee National Forest, Forest
13 Supervisor, and U.S. FOREST
   SERVICE,
14
   Defendants,
15
   S. MARTINEZ LIVESTOCK, a
16 Washington Corporation,
   Defendant-Intervenor.
17

18

19

20

# TABLE OF CONTENTS

MOTION .......................................................................... 1

INTRODUCTION ............................................................... 2

STATEMENT OF FACTS ..................................................... 3

I.    Bighorn Sheep Face a Serious Risk of Disease Transmission
      and Catastrophic Die-offs from Direct Contact with Domestic
      Sheep. ...................................................................... 3

II.   The Forest Service and Other Agencies Have Closed Domestic
      Sheep Allotments to Protect Bighorn Sheep from Disease
      Transmission. ........................................................... 6

III.  The Okanogan-Wenatchee National Forest Supports Most of
      the Bighorn Sheep in Washington State. ........................... 9

IV.   Domestic Sheep Grazing on the Wenatchee Allotments
      Threatens Bighorn Sheep Throughout the Forest and
      Washington State. ..................................................... 12

V.    The Forest Service Has Continued to Authorize Grazing
      While It Delays a New NEPA Analysis of Bighorn Sheep
      Conflicts. ............................................................... 16

ARGUMENT ................................................................... 19

I.    THE FOREST SERVICE VIOLATED NFMA AND
      NEPA. .................................................................... 19

      A. The Forest Service's Authorization of Grazing on the
         Wenatchee Allotments in 2016–2020 Was Inconsistent
         with the Forest Plan. ............................................ 20

         1. Viability directive .......................................... 23

         2. Prevent and plan directive .............................. 26

         3. Directive to cooperate with WDFW on
            reintroductions ............................................ 28

B.  The Forest Service Violated NEPA By Failing to
Supplement Old NEPA Analyses and to Stop
Authorizing Grazing in the Interim. ......................... 29

    1.  *Supplementation* ............................................. 31

    2.  *Irreversible and Irretrievable Commitment of
    Resources*........................................................... 33

II.    IRREPARABLE HARM IS LIKELY TO OCCUR TO
BIGHORN SHEEP AND THE PLAINTIFFS. ................. 36

III.   THE EQUITIES TIP SHARPLY IN FAVOR OF AN
INJUNCTION TO PROTECT BIGHORN SHEEP. .......... 39

CONCLUSION ................................................................. 40

## TABLE OF AUTHORITIES

### Cases

*All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011) .... passim

*All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105

    (9th Cir. 2018)..................................................................22

*Anderson v. Evans,* 371 F.3d 475, 501 (9th Cir. 2004)................................34

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020)..............................20

*Buckingham v. Sec'y of the U.S. Dep't of Agric.,* 603 F.3d 1073

    (9th Cir. 2010)..................................................................21

*Cal. ex rel. Van De Kamp v. Tahoe Regl. Plan. Agency*, 766 F.2d 1319

    (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985) ......................1

*Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988) ......................................34

MOTION FOR PRELIMINARY INJUNCTION MEMORANDUM          ii

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) .........33

*Gallatin Wildlife Ass'n v. USFS*, 2016 WL 3282047

      (D. Mont. June 14, 2016) ....................................................31

*Idaho Sporting Congress v. Thomas,* 137 F.3d 1146 (9th Cir. 1998)

      (en banc)..................................................................30

*Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095 (9th Cir. 2016)  7, 8, 25

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005)................................4

*League of Wilderness Defenders/Blue Mountain Biodiversity Project v.*

      *Connaughton*, 752 F.3d 755 (9th Cir. 2014).......................................36

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989).....................29, 30

*Metcalf v. Daley,* 214 F.3d 1135 (9th Cir. 2000) ..........................................34

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953

      (9th Cir. 2005)...........................................................20

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006)

      ("ONDA I")................................................................20, 21

*Or. Nat. Desert Ass'n v. U.S. Forest Service*, 957 F.3d 1024 (9th Cir. 2020)

      ("ONDA II") ...............................................................21, 25

*Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889 (D. Or. 2012)

      ("ONDA III")............................................................. passim

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) ........20

*Sierra Club v. Bosworth*, 465 F. Supp. 2d 931 (N.D. Cal. 2006)..................33

*W. Watersheds Project v. U.S. Forest Serv.*, No. CV-07-151-E-BLW,

      2007 WL 3407679 (D. Idaho Nov. 13, 2007) ("WWP I").......... passim

*W. Watersheds Project v. U.S. Forest Serv*, No. CV-07-151-E-BLW,

      2007 WL 1729734 (D. Idaho June 13, 2007) ("WWP II").......... passim

*W. Watersheds Project v. U.S. Forest Serv*., No. 1:17-cv-434-CWD,

      2017 WL 5571574 (D. Idaho Nov. 20, 2017) ("WWP III") ...... passim

*W. Watersheds Project v. BLM*, No. 09-0507-BLW,

      2009 WL 3335365 (D. Idaho Oct. 14, 2009) ("WWP IV") ...... passim

*Winter v. NRDC*, 555 U.S. 7 (2008)..............................................19

*United States v. Estate of Hage*, 810 F.3d 712 (9th Cir. 2016)....................21

**Statutes**

16 U.S.C. § 1604(i) .......................................................................21

42 U.S.C. § 4332(2)(C) ..................................................................29

**Regulations**

36 C.F.R. § 219.19 (1982)..............................................................22

40 C.F.R. § 1501.2 (1978).............................................................29

40 C.F.R. § 1502.2 (1978).........................................................29, 30

40 C.F.R. § 1502.5 (1978).............................................................29

40 C.F.R. § 1502.9 (1978).............................................................29

1

40 C.F.R. § 1502.9 (2020)..............................................................29, 30

2

40 C.F.R. § 1506.1 (1978)..............................................................29, 30

3

40 C.F.R. § 1506.1 (2020)..............................................................29

4

**Other**

5

85 Fed. Reg. 43,304 (July 16, 2020) ........................................29

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

**MOTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs WildEarth Guardians and Western Watersheds Project hereby move to enjoin Defendant U.S. Forest Service from authorizing domestic sheep grazing on the Rattlesnake, Nile, Naches, Manastash, Eagle Blagg, Switchback, and Mosquito Ridge allotments within the Okanogan-Wenatchee National Forest before the 2021 grazing season. The Forest Service has determined there is a high risk that domestic sheep grazing these allotments will transmit disease to four bighorn sheep herds that make up about two-thirds of all bighorn sheep within this National Forest and nearly 50% of all bighorn sheep in Washington state. Disease outbreaks can happen quickly and cause die-offs of entire herds, which threatens to irreparably harm a substantial portion of bighorn sheep in the state. Despite these serious risks, the Forest Service is poised to authorize grazing again this spring and thereby violate the National Forest Management Act and the National Environmental Policy Act.

To prevent such irreparable harm, Plaintiffs request that the Court enter a preliminary injunction that prohibits grazing on these allotments while this case is pending. In light of the public interest nature of this case, Plaintiffs request that this Court waive any bond under Federal Rule of Civil Procedure 65(c). *Cal. ex rel. Van De Kamp v. Tahoe Regl. Plan. Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985).

1

**INTRODUCTION**

2     Plaintiffs WildEarth Guardians and Western Watersheds Project seek a

3   preliminary injunction that prohibits domestic sheep grazing on the Rattlesnake,

4   Naches, Nile, Manastash, Eagle-Blagg, Switchback, and Mosquito Ridge

5   allotments (the "Wenatchee Allotments") within the Okanogan-Wenatchee

6   National Forest while this case is pending.[1]  Allowing grazing on these allotments

7   creates a high risk that domestic sheep will contact bighorn herds that have core

8   habitat on or adjacent to the allotments.  If contact between the species occurs,

9   disease transmission to bighorns is likely and can quickly spread and lead to

10   population-level harm and die-offs.  Catastrophic die-offs have occurred several

11   times in Washington, including in 2013 when the Tieton bighorn herd near the

12   southern Wenatchee Allotments[2] was extirpated shortly after an outbreak began.  A

13   disease outbreak in one herd can spread to other herds and affect a large portion of

14   the bighorns not only on the Forest but within the state—a devastating result.

15     For at least a decade, the Forest Service has known of these risks and

16   recognized that they warrant preparation of a new environmental analysis under the

17

18   [1] Counsel for the Forest Service could not confirm whether the agency will prohibit

19   grazing on any allotments this year.

20   [2] The term "southern allotments" means Naches, Nile, Rattlesnake, and Manastash.

21

National Environmental Policy Act (NEPA) and new grazing decisions under the National Forest Management Act (NFMA). But rather than closing these high-risk allotments *until* the new analyses are completed—as the agency has done in other states—it has continued to authorize grazing on most of the Wenatchee Allotments. In so doing, the agency has violated its duties under NFMA to protect bighorn sheep populations and its duties under NEPA to supplement outdated analyses and prevent an irreversible commitment of resources in the interim.

The need to cease domestic sheep grazing on these allotments is urgent due to a disease outbreak in the Cleman Mountain bighorn herd that began in late 2020. Habitat for this herd overlaps the southern allotments, putting this herd at very high risk of disease transmission, according to the agency's own analysis and its longtime National Bighorn Sheep Biologist. The outbreak was caused by contact with domestic sheep, and further infection of this herd will decimate it and perhaps extirpate it entirely. To prevent such harm and further the public interest in this iconic species, the Court should enjoin grazing while this case is pending.

## STATEMENT OF FACTS

### I.    Bighorn Sheep Face a Serious Risk of Disease Transmission and Catastrophic Die-offs from Direct Contact with Domestic Sheep.

Bighorn sheep populations have declined precipitously across the continent, bottoming out at approximately 10% of their historical numbers by the early 1990s. *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1098 (9th Cir. 2016). The

1    species has a "long history" of suffering from "large-scale, rapid, all-age die-offs"

2    that cause partial or complete extirpation of herds, many of which have been

3    associated with contact between bighorn sheep and domestic sheep.  Ex. 1 at 6.[3]

4         The Forest Service, other land managers, and scientists have analyzed this

5    issue extensively for more than a decade.  The science has evolved considerably

6    during that time and now conclusively shows that *Mycoplasma ovipneumoniae*

7    ("*Movi*") is the pathogen responsible for disease transmission from domestic sheep

8    to bighorn sheep.  *See* Ex. 1 at 8–14 (2010 NEPA analysis of science); Ex. 2 (2018

9    study); Besser Decl. ¶¶ 15–40 (describing science).[4]  While domestic sheep

10   naturally carry *Movi* without any harm to them, in bighorns, the pathogen triggers

11   pneumonic disease and die-offs in herds.  Ex. 1 at 6; Besser Decl. ¶¶ 24–31 (noting

12   about 90% of domestic sheep sampled in a study tested positive for *Movi*).

13

—————————————————

14   [3] Numbered exhibits cited within and supporting this motion are attached to the

15   Declaration of Elizabeth H. Potter.  Citations are to internal page numbers in each

16   exhibit's footer, which will match the page numbers added through ECF.  Other

17   declarations filed herewith and cited herein are described by last name and "Decl."

18   [4] The Court should consider declarations like this that describe complex issues and

19   identify factors the agency should have considered, like the risks of irreparable

20   harm.  *Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005).

21

Die-offs can happen rapidly because bighorn sheep transmit *Movi* to other members of their herds, and ewes pass it on to their unborn lambs, which then die within weeks of birth. Ex. 2 (describing nine die-offs in five states during winter 2009–2010); Ex. 1 at 9–10; Besser Decl. ¶¶ 19, 40. Poor lamb recruitment and disease persists in herds for several years or even decades, preventing recovery and threatening infection of adjacent herds. Ex. 1 at 9; Ex. 2 at 6–7, 9; Besser Decl. ¶¶ 18, 37, 40. There are a wide diversity of *Movi* strains, so herds that survive a die-off are not protected from future die-offs if exposed to a different strain of *Movi*. Ex. 4 ¶¶ 8, 32 (past declaration from former BLM National Bighorn Sheep Program Coordinator); Besser Decl. ¶¶ 27–31, 38–40. Once bighorns become infected, "no management action, absent population eradication, has successfully stopped a pneumonia outbreak, and there is no evidence that any intervention has consistently reduced morbidity, mortality, or spread of disease." Ex. 2 at 10.

These catastrophic and persistent problems can result from even one or two instances of contact between the species. Ex. 4 ¶ 32 (even one or two contacts that transmit disease can pose "major persistency problems"); Ex. 1 at 14 (high probability of disease transfer after contact). Thus, preventing contact between domestic and bighorn sheep is the only way to stop disease outbreaks from happening. Ex. 2 at 8, 11; Ex. 5 at 2–3. However, the species are likely to come into contact when grazing the same range or adjacent areas for several reasons.

First, domestic sheep and bighorn sheep are attracted to each other and seek each other out if in the same vicinity because they are in the same genus and are gregarious.  Ex. 4 ¶ 20; Schommer Decl. ¶ 36; Ex. 1 at 12.  Second, bighorn sheep make long exploratory movements, called forays, traveling up to twenty miles or more from their home ranges to explore new habitat or find mates.  Ex. 4 ¶ 21; Ex. 1 at 15–20; Schommer Decl. ¶ 37.  Third, domestic sheep often stray from their band, sometimes traveling far from the allotment, and can remain on the landscape, unattended, for weeks or months.  Ex. 1 at 25–26; Ex. 4  ¶¶ 25–26.  The steep, rugged terrain used by bighorn and domestic sheep make it hard to spot bighorns or find stray domestics, and therefore it is unlikely contact would be observed before a disease outbreak.  Ex. 1 at 24–26; Ex. 4 ¶ 26.  These factors render best management practices (BMPs), such as using herders and dogs with domestic bands and calling the agency if a bighorn is spotted, ineffective at keeping the species separated on the range.  Ex. 1 at 22–29; Ex. 4 ¶ 29; Ex. 3 at 3 (agency expert stating separation "is far easier said than done"); Schommer Decl. ¶ 53.

For all of these reasons, experts agree that effective spatial separation between domestic and bighorn sheep is necessary to prevent disease transmission between the species.  Ex. 5 at 3; Ex. 6 at 4; Ex. 2; Schommer Decl. ¶ 53.

## II.    The Forest Service and Other Agencies Have Closed Domestic Sheep Allotments to Protect Bighorn Sheep from Disease Transmission.

In recent years, the Forest Service—often in response to litigation or court

1   orders—has stopped domestic sheep grazing on multiple allotments within or near

2   bighorn sheep habitat that posed a high risk of contact and disease transmission

3   between the species across several National Forests.

4        In 2007, in response to a lawsuit filed by Plaintiff WWP and others, the

5   Forest Service temporarily closed several allotments in Idaho while it assessed new

6   information about the risk of contact between the species and prepared new NEPA

7   analyses. *W. Watersheds Project v. U.S. Forest Serv.*, No. CV-07-151-E-BLW,

8   2007 WL 3407679, at *1 (D. Idaho Nov. 13, 2007) ("*WWP I*"); Ex. 7 at 3

9   (justifying non-use in the interim).  Some permittees challenged those closures, but

10  the court found that the agency's decisions were well-supported by the science and

11  experts. *WWP I*, at *2, 4; *W. Watersheds Project v. U.S. Forest Serv*, No. CV-07-

12  151-E-BLW, 2007 WL 1729734, at *1–4 (D. Idaho June 13, 2007) ("*WWP II*").

13       Subsequently, the Payette National Forest studied disease transmission and

14  issued a detailed Environmental Impact Statement (EIS) and Record of Decision

15  (ROD) that closed more than 15 domestic sheep grazing allotments; those

16  allotments posed a very high, high, or moderate risk of contact to bighorns and

17  made up about 70% of suitable rangelands on that forest.  Ex. 8 at 16–17, 14, 26–

18  29; Ex. 1 (scientific support).  The Ninth Circuit upheld the decision in response to

19  an industry challenge. *Idaho Wool Growers*, 816 F.3d at 1098–99, 1110.

20       In that case, the Ninth Circuit determined the Forest Service's reliance on its

21

1    "Risk of Contact" modeling—which the agency developed during the Payette EIS

2    process to predict bighorn movements to allotments—was reasonable.  *Id*. at 1100–

3    01, 1107–08.  That modeling was developed by "leading experts in the field" to

4    determine the risk of contact between the species based on the core herd home

5    range of bighorn herds and a foray analysis that mapped the likelihood of bighorns

6    traveling outside of their home ranges onto allotments.  *Id*. at 1107–08.

7    Subsequently, the Forest Service began using its Risk of Contact modeling as its

8    standard for assessing bighorn and domestic sheep conflicts across western states.

9    *See* Ex. 9 at 9 (explaining the model provided "a strategy and consistent analysis

10    tools to assess the potential contribution of Forest Service active domestic sheep

11    allotments to bighorn sheep disease events"); Schommer Decl. ¶ 9.  The model

12    notably does not consider domestic sheep straying from allotments, even though

13    strays "may pose a risk of transmission as large as or greater than do foraying

14    bighorn sheep"—which may add more risk than the model reveals.  Ex. 9 at 73.

15        More recently, Plaintiffs obtained a preliminary injunction to stop the Forest

16    Service from authorizing grazing on two allotments in the Caribou-Targhee

17    National Forest in Idaho.  *W. Watersheds Project v. U.S. Forest Serv*., No. 1:17-cv-

18    434-CWD, 2017 WL 5571574, at *3, 15 (D. Idaho Nov. 20, 2017) ("*WWP III*").

19    The court reasoned that Plaintiffs were likely to succeed in showing that domestic

20    sheep grazing on those allotments threatened the viability of a bighorn herd nearby,

21

in violation of NFMA.  *Id*. at 12–13.  Subsequently, the agency agreed not to authorize grazing there until it completed a new NEPA analysis.  Ex. 10 at 7.

The Bureau of Land Management (BLM) also relies on the Forest Service's Risk of Contact model to analyze the risks that its domestic sheep grazing allotments pose to bighorn sheep.  Ex. 6 at 8–9.  And like the Forest Service, BLM has closed allotments that threaten bighorn sheep—sometimes in response to litigation—while it completes new NEPA analyses regarding the risk of contact between the species.  *W. Watersheds Project v. BLM*, No. 09-0507-E-BLW, 2009 WL 3335365, at *1, 7 (D. Idaho Oct. 14, 2009) ("*WWP IV*") (issuing preliminary injunction); Ex. 11 at 2–3 (closing a "relatively high" risk allotment "due to the potential for irreparable harm" in the interim); Ex. 12 (upholding closure).  After BLM completed a new EIS for allotments that it temporarily closed in Idaho, it permanently closed three that presented a high risk of contact.  Ex. 13 at 3, 6–9.

### III.   The Okanogan-Wenatchee National Forest Supports Most of the Bighorn Sheep in Washington State.

Bighorn sheep were extirpated in Washington state by the early 20th century but reintroduction efforts have reestablished herds in part of the species' historical habitat.  Ex. 14 at 4.  The Washington Department of Fish and Wildlife (WDFW) estimates that roughly 1,700 bighorn sheep in 16 herds remain.  Ex. 15 at 5; Ex. 16 at 5 (map of herds).  WDFW has stressed that a majority of these herds are below the carrying capacity of their habitat, Ex. 15 at 5, which means that herds and

populations could expand.  Schommer Decl. ¶¶ 24–31 (describing population

fluctuations and carrying capacity for many herds).  But disease outbreaks have led

to die-offs or chronic low reproduction for many bighorn herds, which suppresses

these populations.  *Id*. ¶¶ 26, 28–31; Ex. 16 at 5, 7; Ex. 14 (study noting recent die-

offs required lethal removal within three herds).  Given that herds unaffected by

disease "have thrived," Ex. 16 at 5, WDFW considers disease transmission to be

"the overwhelming management concern" for the species.  *Id*.; Ex. 15 at 5.

Of the 16 herds in the state, 10 have core home ranges that overlap with or

are within foray distance of the Okanogan-Wenatchee National Forest.  Ex. 17 at 3.

These herds constitute *about 70%* of all bighorns within the state.  *Id*.  The

majority of these herds occupy low elevation areas near major rivers or lakes in

steep rocky habitat and shift use within their core home range to find forage, avoid

predators, and adapt to new conditions.  Schommer Decl. ¶¶ 5–6, 8, 10, 14–20.

According to Tim Schommer—the Forest Service's National Bighorn Sheep

Biologist for nearly twenty years who has substantial experience in this area and

with these herds—there are likely two distinct bighorn meta-populations[5] at issue

in this case: one in the more northern Wenatchee area, which includes the Manson,

---

[5] Meta-populations—which consist of several herds that have connected habitat

and frequently interact—are common with bighorn herds.  Schommer Decl. ¶ 20.

Chelan Butte, Swakane, and Quilomene herds; and another in the more southern

Yakima area, which includes the Umtanum, Cleman Mountain, and Tieton herds.

*Id.* ¶¶ 5, 20–23. The herds within the Wenatchee meta-population are less than 10

air miles from each adjacent herd, which is well within common foray distances, so

forays between these herds have likely occurred and are likely to continue. *Id.*

¶¶ 21, 22. The herds within the Yakima meta-population have even greater

connectivity, meaning interactions between these herds has likely occurred as well.

*Id.* ¶ 23. Overall, bighorn habitat for these two meta-populations is excellent and

could support larger herds if disease threats that plague herds subsided. *Id.* ¶ 32.

In the Wenatchee meta-population, the Quilomene herd—the first herd

reintroduced in the region—has had repeated cycles of population expansion and

then crashing from disease die-offs between the 1970s and the present. *Id.* ¶ 28. In

2020, bighorns in the herd were seen with a domestic sheep, which prompted

WDFW to quickly kill twelve bighorns for testing—which fortunately came back

negative for *Movi*. *Id.* While other herds in the meta-population have not tested

positive for disease, the Swakane, Manson, and Chelan Butte herds are currently or

were recently below WDFW's population objectives. *Id.* ¶¶ 25–27.

In the Yakima meta-population, the Umtanum (or Selah Butte) herd suffered

a disease outbreak in 2009 that killed 50% of the herd and continues to threaten it.

Ex. 16 at 5; Schommer Decl. ¶ 30. A disease outbreak in the Tieton herd near

Naches during 2013 caused such severe mortality that WDFW killed all remaining members of the herd to stop disease from spreading to the nearby Cleman Mountain herd.  Ex. 14 at 56–57 (noting the state's difficult decision and "considerable effort" to kill herd); Schommer Decl. ¶ 31.  WDFW cannot fulfill its goal of reintroducing bighorns to the Tieton range until the threat of disease transmission subsides.  Ex. 16 at 7; Ex. 14 at 22.  In the nearby Cleman Mountain herd, WDFW discovered a disease outbreak during fall 2020.  Schommer Decl. ¶¶ 28–29.  Subsequent testing confirmed the presence of a domestic sheep strain of *Movi* in several bighorns from that herd, and WDFW received many reports of coughing or dead bighorns from the public.  *Id.* ¶ 29; Besser Decl. ¶¶ 38–39.

### IV.    Domestic Sheep Grazing on the Wenatchee Allotments Threatens Bighorn Sheep Throughout the Forest and Washington State.

The Forest Service allows one company to graze domestic sheep on nine allotments within the Okanogan-Wenatchee National Forest.  Ex. 18 (Grazing Permit); Ex. 19.  Seven of these allotments—Rattlesnake, Nile, Naches, Manastash, Eagle Blagg, Switchback, and Mosquito Ridge (collectively "the Wenatchee Allotments")—overlap with, or are very near core home range for the Chelan Butte, Swakane, Umtanum, and Cleman Mountain herds—along with the former Tieton herd.  Cain Decl. ¶ 9, Ex. B (map).  These herds make up about two-

thirds of all bighorns that inhabit the Forest, and nearly half within the state.[6]

Little monitoring of these bighorn herds has occurred to track their movement, but good habitat connectivity and close proximity makes it likely that bighorn forays to allotments do occur and also that if bighorns from one herd become infected, disease will spread to another herd or herds and cause catastrophic die-offs.  Schommer ¶¶ 19, 37, 42–45, 57–59, 62; Ex. 14 at 20 (noting the likelihood that *Movi* would have spread to the Cleman Mountain herd and "caused substantial mortality" without killing the remaining members of the Tieton herd in 2013).  Thus, habitat connectivity between the allotments and core herd home range increases the risks of disease transmission to six herds on the Forest.

Within the Wenatchee meta-population, habitat connectivity and the proximity of the Eagle Blagg, Switchback, and Mosquito Ridge allotments to the Swakane herd core home range make it "very likely" that the species will comingle and cause disease transfer to bighorns in that herd.  Schommer Decl. ¶ 39.  The Mosquito Ridge allotment also poses a "very high" risk of contact with the Chelan Butte herd, which is less than 10 air miles away.  *Id*. ¶ 41.  While the Manson and

---

[6] These figures were calculated with 2018 WDFW data.  *See* Cain Decl. ¶ 8, Ex. A (1,720 sheep statewide; 785 within these four herds; and 389 within the Forest's five other herds—Vulcan, Mt. Hull, Sinlahekin, Manson, and Quilomene.)

Quilomene herds are farther from these allotments, they are at "very high" risk of contact with diseased bighorns from the Swakane herd if that herd becomes infected. *Id*. ¶¶ 42, 50.  Recent wildfires that burned nearly 50,000 acres within the Swakane habitat have opened up the landscape and further increased the risk of contact with domestic sheep using the allotments and other herds.  *Id*. ¶ 42.

In the Yakima meta-population, the four southern allotments—Rattlesnake, Nile, Naches, and Manastash—are all within 10 air miles of the Cleman Mountain herd core habitat; good connectivity habitat exists between the core home range of the Cleman Mountain herd and these allotments, while the Naches allotment directly overlaps with the herd's habitat, creating a "high potential" for bighorns to move onto these allotments.  *Id*. ¶ 43.  Although the Umtanum herd is at least 15 air miles from these allotments, it has a high potential for contact with bighorns from the Cleman Mountain herd that has tested positive for *Movi*.  *Id*. ¶ 45.  Recent wildfires heavily burned the Umtanum core herd home range, which can cause bighorns to shift habitat use and further increase connectivity between herds.  *Id*.

These serious risks from grazing the Wenatchee Allotments have led WDFW to urge the agency to address this "continuing threat to bighorns" that the state believes is a "high priority."  Ex. 20 at 2, 4.  These concerns were echoed by another sovereign—the Yakama Nation—earlier in a 2010 letter to the Chief of the Forest Service calling for termination of the grazing permit or relocation of grazing

1 by at least 35 miles to ensure "complete separation" to protect bighorn sheep—a

2 "very highly valued cultural resource of the Yakama Nation."  Ex. 21 at 2–3.

3     A year later, the Chief of the Forest Service directed the Forest to run the

4 Risk of Contact model and prepare a new NEPA analysis.  Ex. 17 at 14.  But the

5 agency failed to initiate an analysis until 2013 and did not complete the modeling

6 until 2016.  Ex. 22 (2011 meeting notes); Ex. 23 at 5 (analysis began in 2013);  Ex.

7 23 (risk of contact report).  The results, summarized below, show the Wenatchee

8 Allotments exceeded the model's 0.08 contacts/year high-risk threshold—which is

9 based on the agency's recommendation of disease-free intervals of at least 50

10 years—for the Cleman Mountain, Umtanum, Swakane, and Chelan Butte herds,

11 along with the former Tieton herd.  Ex. 23 at 10–11; Schommer ¶¶ 47–48.

| Risk of contact to each herd from allotments based on telemetry-derived core herd home range (contacts/year) | | | | | |
|---|---|---|---|---|---|
| Allotment | Chelan Butte | Cleman | Swakane | Tieton | Umtanum |
| *Rattlesnake* | | 0.68 | | 0.17 | |
| *Naches* | | Intersects | | 0.18 | 0.13 |
| *Nile* | | Intersects | | 0.12 | |
| *Manastash* | | .27 | | | |
| *Eagle-Blagg* | | | 0.84 | | |
| *Mosquito Ridge* | 0.11 | | 0.22 | | |
| *Switchback* | | | 0.11 | | |

Ex. 23 at 11–12.  The Swakane and Cleman Mountain herds have "extremely high"

risk of contact modeling results, which puts nearby herds within those meta-

populations at a high risk as well.  Schommer Decl. ¶¶ 48, 51, 52.

    These model results likely understate the risk to bighorns from domestic

MOTION FOR PRELIMINARY INJUNCTION MEMORANDUM          15

sheep grazing on the Wenatchee Allotments, because the Risk of Contact model does not account for domestic sheep straying.  Ex. 9 at 73.  Conditions on the Forest—steep and forested areas with low visibility that makes it hard to track and control domestic sheep—create a high potential for stray domestic sheep and poor effectiveness of BMPs.  Schommer Decl. ¶ 55; LeRoux Decl. ¶¶ 19–21 (observations of conditions).  WDFW has received reports that "indicate co-mingling and stray domestic sheep are substantial continuing problems and have led to bighorn die-offs" in the area.  Schommer Decl. ¶¶ 33–38. Thus, the risk of contact is likely even higher than the model's results showed.  *Id*. ¶ 46.

### V.    The Forest Service Has Continued to Authorize Grazing While It Delays a New NEPA Analysis of Bighorn Sheep Conflicts.

The 2016 Risk of Contact report recommended that the Forest Service prepare a new NEPA analysis for the Wenatchee Allotments and identified the Cleman Mountain and Tieton herds as "a top priority."  Ex. 23 at 13.  Shortly after completing the report, the agency admitted that "we have new info [that] must be used to supplement old NEPA" for domestic sheep allotments and that the "[p]ossibility of an injunction appear high."  Ex. 24 at 2–4.  A few months later, in August 2016, the Forest Service prepared talking points for a stakeholder meeting that stated, "[t]he Risk of Contact modeling has clearly displayed the need for the Forest to update our domestic sheep grazing NEPA Forest-wide" and that the agency was planning to begin that process later that year.  Ex. 25 at 5.

MOTION FOR PRELIMINARY INJUNCTION MEMORANDUM          16

1    Despite these admissions in 2016 and the urgency of the underlying issue,

2    the Forest Service waited until May 2019 to officially start a new NEPA process.

3    Ex. 26 (Federal Register notice); Ex. 17 at 15 (admitting the NEPA process did not

4    start until 2019).  The timeline for that process has already been extended multiple

5    times since then.  *E.g.*, Ex. 26 at 2 (estimating a final EIS in July 2020); Ex. 28

6    (estimating a final EIS in November 2021).

7    Furthermore, the agency has bifurcated its NEPA process into two steps

8    such that the supplemental NEPA analysis for the allotments will be delayed even

9    more—likely needing several more years for completion.  Currently, the agency is

10   revising its Forest Plan and will determine whether to include new direction for

11   domestic sheep grazing.  Ex. 26 at 2.  This first step will not change grazing on any

12   existing allotments.  *See* Ex. 29 (stating "no existing allotments would change as a

13   result").  Only after it revises its Forest Plan will the agency begin a second NEPA

14   process for the allotments "to evaluate conditions relative to risk of contact and

15   ability to mitigate risk at the allotment scale."  *Id*.  Thus, the current NEPA process

16   will not affect the governing Allotment Management Plans (AMPs) for the

17   Wenatchee Allotments and their accompanying NEPA analyses—which are more

18   than 20 years old for the northern allotments and nearly as old for the southern

19   ones.  Ex. 30 at 165 (noting the AMPs are from 2000 and 2004 respectively); *see*

20   Ex. 26 at 2 (admitting AMPs will be updated later).  The agency has no estimate of

21

1    when the second step of the process will begin, let alone end and lead to changes in

2    site-specific changes for the allotments.  Answer ¶ 115.

3          Despite knowing for years of these risks and the need for action, the Forest

4    Service has authorized grazing since 2016 of up to 550–815 sheep on each of the

5    Rattlesnake, Nile, Manastash, Eagle-Blagg, and Mosquito Ridge allotments for a

6    few weeks or a few months each year under annual operating instructions (AOIs).

7    Ex. 30 at 4–5, 39–40, 73–74, 107–108, 141-142.  The agency has made some

8    changes from the grazing permit: it has generally authorized fewer sheep than

9    allowed under the permit, temporarily allowed cattle—not sheep—to graze on the

10    Naches allotment since 2017, did not allow grazing on the Switchback allotment

11    during this time, and did not allow grazing on the Eagle-Blagg allotment in 2020.

12    *Compare* Ex. 30 at 141–42 *with* Ex. 18 at 1.  But, unlike other forests that have

13    faced this situation, it has refused to implement the only measure known to *prevent*

14    disease transmission—separation of domestic sheep from bighorn sheep by

15    substantial distances.  Schommer ¶ 55.

16          In recent years, management issues and conditions nearby have worsened.

17    The permittee has reported many domestic sheep as dead, injured, or missing at the

18    end of the grazing season, in part due to problems with wolves or other predators.

19    Ex. 31 at 2–12 (emails about lost sheep in 2013 as the Tieton disease outbreak was

20    unfolding); *id*. at 13, 14, 18, 24 (2018 and 2019 reports); *id*. at 15–31 (problems

21

with predators).  Reports of contact between the species outside of the Forest have

risen, a bighorn was recently observed adjacent to an allotment, and a disease

outbreak arose in the Cleman Mountain herd, putting bighorns at even greater risk

of die-offs.  Ex. 32; Schommer Decl. ¶¶ 34–38.  Given these circumstances,

continuing to graze the Wenatchee Allotments is unreasonable.

## ARGUMENT

When deciding whether to grant a preliminary injunction, a court considers

four factors: (1) the likelihood that the plaintiffs will ultimately succeed on the

merits of their claims, (2) the likelihood that the plaintiffs will suffer irreparable

harm without preliminary injunctive relief, (3) the balance of equities between the

parties, and (4) whether preliminary injunctive relief is in the public interest.

*Winter v. NRDC*, 555 U.S. 7, 20 (2008).  A sliding scale approach is used in the

Ninth Circuit, where a preliminary injunction is appropriate if a plaintiff has raised

serious questions about the merits and the balance of hardships tips sharply in

plaintiffs' favor.  *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134–35 (9th

Cir. 2011).  Here, all four factors weigh in favor of a preliminary injunction to

protect bighorn sheep from the serious risks of disease transmission if domestic

sheep grazing on the Wenatchee Allotments occurs while this case is pending.

## I.    THE FOREST SERVICE VIOLATED NFMA AND NEPA.

"Serious questions need not promise a certainty of success, nor even present

a probability of success, but must involve a fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (quotations omitted). Here, Plaintiffs have *at least* a fair chance of success on their claims that 1) the Forest Service violated NFMA by authorizing grazing on the Wenatchee Allotments in 2016–2020 in a manner inconsistent with the Forest Plan; 2) violated NEPA by failing to supplement old analyses with new evidence about serious risks from grazing; and 3) violated NEPA by authorizing grazing that threatens irreversible harm to bighorns before it completes a new NEPA analysis.

Courts review such NFMA and NEPA claims under the Administrative Procedure Act (APA) to determine whether agency actions are arbitrary and capricious. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020). Under the APA, courts conduct a "substantial inquiry" and "a thorough, probing, in-depth review" to see if the agency examined relevant data and made a "rational connection between the facts found and the conclusions made." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (cleaned up).

### A.   The Forest Service's Authorization of Grazing on the Wenatchee Allotments in 2016–2020 Was Inconsistent with the Forest Plan.

Under NFMA, the Forest Service manages grazing allotments through permits that identify the number and class of livestock allowed and AMPs that prescribe the manner in which grazing must be conducted to comply with multiple-use goals and other requirements. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465

F.3d 977, 979 (9th Cir. 2006) ("*ONDA I*").  But grazing under a federal permit is a

privilege—not a right, *United States v. Estate of Hage*, 810 F.3d 712, 717 (9th Cir.

2016)—and cannot go forward unless and until the Forest Service authorizes

grazing in advance of each season.  *See ONDA I*, 465 F.3d at 984–85 (explaining

that an annual authorization is the Forest Service's "last word" that allows a

permittee to graze each season).  Annual authorizations—often in the form of

AOIs—allow the agency to respond to new developments or resource conditions—

such as wildfire, compliance problems, or sensitive species concerns—by altering

or curtailing grazing plans for the season.  *Id.*  As such, AOIs are final agency

actions subject to challenge under the APA, *id*. at 990, even after a grazing season

has ended.  *See Or. Nat. Desert Ass'n v. U.S. Forest Service*, 957 F.3d 1024, 1032

(9th Cir. 2020) ("*ONDA II*") (confirming such claims are not moot).

Site-specific grazing decisions like AOIs must be consistent with the

governing Forest Plan under NFMA. 16 U.S.C. § 1604(i); *Buckingham v. Sec'y of*

*the U.S. Dep't of Agric.,* 603 F.3d 1073, 1077 (9th Cir. 2010); *see ONDA II*, 957

F.3d at 1035 (explaining that decisions must "strictly comply with a forest plan's

standards, which are considered binding limitations") (quotation marks omitted).

The Wenatchee Forest Plan includes three key standards to protect bighorn

sheep, which are designated as a Forest Service Sensitive Species, Ex. 33 at 3:

- The current management direction for these species is to maintain viable
  populations and distribution of suitable habitat for these species to prevent

1  them from being listed as Federally threatened or endangered species. *Id.* at 3;[7]

2  • Prevent introduction of disease(s) from livestock into resident herds of bighorn
3    sheep by identifying potential problem areas, and developing a plan to mitigate
     the identified problems. *Id.* at 6 (#6).

4  • Coordinate and cooperate with the [WDFW] in relocation of animals. Add
     additional animals where habitat is under utilized and remove animals where
5    habitat is over utilized. *Id.* at 171 (#4).

6  Thus, contrary to the agency's position that it must add direction to its Forest Plan

7  *before* taking action to protect bighorn sheep, Ex. 26 at 2, the Forest Plan *already*

8  requires the agency to protect populations of bighorn sheep from disease.

9         From 2016 to 2020, the Forest Service authorized domestic sheep grazing on

10  the Nile, Rattlesnake, Manastash, Eagle-Blagg, and Mosquito Ridge allotments

11  that posed a high risk of disease transmission to three bighorn herds and was thus

12  inconsistent with Forest Plan direction to protect this species. *See* Ex. 30 (AOIs).

13  Rather than taking the only effective action known to prevent domestic sheep from

14  introducing disease to bighorn herds—closing high-risk allotments to ensure

15  adequate spatial separation—the Forest Service relied on ineffective measures like

16  BMPs and reducing sheep numbers. Moreover, rather than helping WDFW

17

18  ─────────────────
     [7] The old NFMA regulations, 36 C.F.R. § 219.19 (1982), include similar direction,

19  and still apply because the Forest Plan was adopted under those regulations. *All.*

20  *for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, n.1 (9th Cir. 2018).

21

achieve its goal of reintroducing the Tieton herd to its former range, the agency

authorized grazing on nearby allotments that prevented WDFW from reintroducing

bighorns there.  Thus, the agency's 2016–2020 grazing authorizations were

inconsistent with the Forest Plan and violate NFMA.

### 1.    Viability directive

The Forest Service's designation of bighorn sheep as a sensitive species

means that the agency *already* has a "concern for [its] long-term viability and/or

conservation status" on National Forest lands and a heighted duty to protect it.  Ex.

26 at 2.  The viability of several bighorn herds that inhabit this Forest is already in

jeopardy due to past or current disease outbreaks and related mortality.  Ex. 15 at

5; Ex. 16 at 5; *see* Schommer Decl. ¶¶ 24–32, 56–64 (detailing disease issues that

are *already* causing long-lasting harm); *see also* Ex. 26 at 3 (admitting disease may

harm the species' viability across the Forest).  Mr. Schommer opines that disease is

the primary threat limiting these populations, as the habitat is excellent and could

support larger herds.  Schommer Decl. ¶ 32.  And the agency is aware of WDFW's

position that eliminating or reducing the risk of contact between the species is

*essential* to the long-term viability of bighorns here.  *Compare* Complaint (ECF

No. 1) ¶ 76 *with* Answer (ECF No. 7) ¶ 76 (admission).

To assess whether domestic sheep grazing threatens the viability of bighorn

sheep, the Forest Service uses its Risk of Contact modeling, Ex. 9 at 9, and relies

on the model's threshold of 0.08 contacts/year as "a good benchmark to *ensure population persistence* until better data are available." Ex. 17 at 16 (emphasis added). In its Risk of Contact Report for this Forest, the agency determined that the Nile, Rattlesnake, Manastash, Eagle-Blagg, and Mosquito Ridge allotments exceed the agency's 0.08 contacts/per year threshold, meaning those allotments pose a high risk to the Cleman Mountain, Swakane, and Chelan Butte. Ex. 23 at 11–14; Schommer Decl. ¶¶ 46–49. By authorizing grazing on allotments that exceeded this threshold, the agency failed to ensure disease free intervals of at least 50 years—a standard its experts recommend as "a potential benchmark to ensure population persistence." Ex. 23 at 10; Schommer Decl. ¶¶ 46–49; *see* Ex. 23 at 14 (explaining that disease outbreaks are expected within 50 years for these herds).

But the actual risks to bighorn sheep were likely *even higher* because the Risk of Contact model does not account for domestic sheep that stray from these allotments, Ex. 9 at 73, which is a problem in this area given the steep and forested terrain and the presence of predators in the area. *See* Ex. 31 (examples of missing or straying in monitoring reports and photos of conditions); Leroux Decl. ¶¶ 19–21 (describing conditions that make tracking sheep difficult); *compare* Complaint ¶ 82 *with* Answer ¶ 82 (admitting that straying can create a higher risk than model's results suggest). Moreover, those three herds can interact with others within their meta-populations due to short foray distances and good connectivity habitat,

1    further increasing the risks of disease spreading to multiple herds on the Forest.

2    Schommer Decl. ¶¶ 50–52.  Authorizing such grazing that placed bighorn sheep

3    *across* the Forest at serious risk of die-offs when the Forest Plan requires the

4    agency to ensure populations remain viable was arbitrary and capricious.

5        In other situations where domestic sheep grazing has posed a high risk of

6    contact with bighorn sheep, the Forest Service has closed allotments to comply

7    with similar viability and sensitive species provisions in other Forest Plans.  Ex. 34

8    at 8 (temporarily closing an allotment while it evaluated new information about the

9    risks of grazing to bighorns given its duty "to maintain species viability"); *Idaho*

10   *Wool Growers*, 816 F.3d at 1105, 1110 (upholding closures of domestic sheep

11   allotments to protect viability of the species).  And where the agency has refused to

12   close high-risk allotments, the District of Idaho found that authorizing domestic

13   sheep grazing that "risks extirpation of a herd" and "potentially will diminish the

14   overall population of bighorn sheep throughout the Forest" likely violated a similar

15   viability provision in a Forest Plan.  *WWP III*, 2017 WL 5571574, at *12–13.

16       The agency's failure to do the same thing here—stopping domestic sheep

17   grazing on high-risk allotments—was inconsistent with the Forest Plan.  *See* Ex. 33

18   at 3, 5 (viability directive).  Thus, the agency's 2016–2020 grazing authorizations

19   violated NFMA.  *See ONDA II*, 957 F.3d at 1035 (such directives are binding).

20

21

1              2.      *Prevent and plan directive*

2          Numerous bighorn experts, the Forest Service, and other agencies admit that

3    the only scientifically defensible way to "prevent" introduction of disease into

4    bighorn herds is through effective separation of the species.  Ex. 5 at 2–3; Ex. 6 at

5    7; Ex. 8 at 18; Schommer Decl. ¶ 53; *see* Ex. 21 at 3 (calling for 35 miles of

6    separation of between the species).  Instead of closing high-risk allotments to

7    create that separation, the agency's "plan" to prevent disease transmission on these

8    allotments has been reducing the number of domestic sheep and imposing BMPs in

9    its AOIs.  *See* Ex. 35 at 3 (explaining this is how the agency has handled the

10   situation as of 2019); Ex. 30 at 150–51 (BMPs in 2020 AOIs).  This plan is

11   unreasonable given that the overwhelming consensus of bighorn experts and

12   wildlife managers is that reducing numbers and using BMPs have not proven

13   effective at keeping the species separate in the type of terrain at issue here.  *E.g.*,

14   Ex. 1 at 22–29 (Mr. Schommer's report for the Payette EIS explaining why BMPs

15   are not effective); Ex. 4 ¶ 29 (former BLM expert); Ex. 3 at 3 (Forest Service

16   expert stating separation "is far easier said than done"); *see also WWP IV*, 2009

17   WL 3335365, at *7 (rejecting the agency's reliance on BMPs given that all the

18   evidence indicated that BMPs are not effective).  This is why agencies have closed

19   allotments that pose a high risk to bighorns, reiterating the lack of science showing

20   other methods are effective.  *See supra* pp. 7–9 (describing such closures).

21

And here, the Forest Service admits that it has known for years that "domestic sheep grazing on these allotments poses a serious risk of disease transmission to bighorn sheep herds that inhabit the Wenatchee National Forest." *Compare* Complaint ¶ 66 *with* Answer ¶ 66 (admitting this allegation). But poor visibility on these allotments and past problems with domestic sheep straying, often due to the unpredictable presence of predators, make it even more likely that BMPs will be ineffective at preventing contact and disease transfer. Schommer Decl. ¶¶ 17, 20, 33–38, 53–55. The permittee's declaration in support of intervention essentially proves this point—he describes a genuine commitment to implementing BMPs and to working cooperatively with the agency and others. ECF No. 10 ¶¶ 11–14. But these laudable efforts have not prevented his domestic sheep from straying and being lost, or from contact occurring between his sheep and bighorns in the state, whether due to grazing on or off the Forest over the years. Ex. 31 at 2–14, 18, 24 (examples from monitoring on the allotment); Ex. 32 (emails about the permittee killing a bighorn that mingled with his domestic sheep outside of the Forest in 2020); Schommer Decl. ¶ 34 (some reports of past contact involving the permittee's sheep). Science and local conditions show that such outcomes are expected and not necessarily due to poor management.

Indeed, as the District of Idaho recently recognized, "[e]ven with flawless execution of BMPs, there is no way that [a permittee] or Forest Service can ensure

1    that domestic sheep will not wander, and that [bighorn] rams will not make forays

2    on or near the allotments while the large herds of domestic sheep are grazing."

3    *WWP III*, 2017 WL 5571574, at *13.  In that case, in 2017, the agency admitted

4    that science does not show BMPs are effective.  *Id*. at n.25.

5          Given the lack of scientific support for BMPs, it was irrational to continue

6    relying on such measures to prevent introduction of disease into bighorn herds

7    from domestic sheep grazing the Nile, Rattlesnake, Manastash, Eagle-Blagg, and

8    Mosquito Ridge allotments in 2016–2020.  By authorizing grazing there, the

9    agency acted inconsistetly with Forest Plan direction that requires prevention of

10   disease transmission and planning to address this risk.  Ex. 33 at 5 (#6) (directives).

11              *3.    Directive to cooperate with WDFW on reintroductions*

12         In a statewide management plan, WDFW set an objective of reintroducing

13   bighorn sheep to the former Tieton range by 2016.  Ex. 16 at 7.  However, it has

14   been unable to fulfill this goal due to the continuing risks of disease transmission

15   from domestic sheep.  Ex. 14 at 22; Schommer ¶ 31.  Indeed, Defendants explained

16   in their answer that "WDFW has cited risk from grazing on the National Forest as

17   an impediment to its goal of relocating bighorn sheep into this area."  Answer

18   ¶ 123.  Moreover, WDFW manages all bighorn herds that inhabit the National

19   Forest for lower population levels than what the habitat could support due to the

20   threat of disease.  Schommer Decl. ¶ 24.  Without that threat, bighorns could

21

occupy more habitat on the National Forest.  *Id.* at ¶ 32; Ex. 15 at 5.  By failing to

do its part to reduce the risk of disease transmission, the Forest Service is acting

inconsistently with Forest Plan direction to coordinate and cooperate with WDFW

in adding bighorns where habitat is underutilized.  Ex. 33 at 171 (#4) (directives).

## B.    The Forest Service Violated NEPA By Failing to Supplement Old NEPA Analyses and to Stop Authorizing Grazing in the Interim.

By requiring agencies to analyze the environmental impacts of their actions,

NEPA "ensures that the agency will not act on incomplete information, only to

regret its decision after it is too late to correct."  *Marsh v. Or. Nat. Res. Council*,

490 U.S. 360, 371 (1989); 42 U.S.C. § 4332(2)(C).  Thus, agencies must complete

an EIS early in the planning process so that it will contribute to the decision-

making process and not simply justify a decision already made.  40 C.F.R.

§§ 1501.2, 1502.5 (1978).[8]  Even after preparing a NEPA analysis, an agency has

an ongoing duty to comply with NEPA and must prepare a supplemental analysis if

---

[8] The 1978 NEPA regulations were effective when the agency authorized grazing

in previous years and began the NEPA process.  *See* 85 Fed. Reg. 43,304, 43,339

(July 16, 2020) (September 14, 2020 effective date for new regulations).

Regardless, the revisions did not meaningfully alter duties to supplement NEPA

analyses when significant new information arises, 40 C.F.R. § 1502.9(d), and avoid

irreversibly committing resources in the interim.  *Id*. §§ 1502.2(f); 1506.1(a).

"[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii) (1978); *Marsh*, 490 U.S. at 372; *see also Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1152 (9th Cir. 1998) (environmental assessments (EA) must be supplemented like an EIS), *overruled on other grounds by Lands Council v. McNair,* 537 F.3d 981 (9th Cir. 2008) (en banc).  Further, the agency must not make an irreversible commitment of resources while preparing a new analysis, such as taking action that would cause ecological harm or limit a choice of reasonable alternatives.  40 C.F.R. §§ 1502.2(f), 1506.1(a) (1978).

For at least a decade, the Forest Service has known that it must analyze new information about the serious risks that domestic sheep grazing poses to bighorn sheep and update its roughly twenty-year-old NEPA analyses of the Wenatchee Allotments' AMPs.  On numerous occasions, the agency has announced its intention to prepare a new NEPA analysis, only to delay the process again and again.  While the agency has consistently failed to prioritize this work, it has found the time to authorize and oversee grazing on the allotments year after year despite a serious risk of catastrophic die-offs to bighorn herds on the Forest.  In so doing, the agency has violated its duties to supplement outdated NEPA analyses and not make an irreversible commitment of resources in the interim.

1          *1.    Supplementation.*

2          Authorizing grazing under AMPs each year constitutes ongoing agency

3    action that warrants supplementation of the underlying NEPA analysis when

4    significant new information about impacts of grazing arises. *Gallatin Wildlife*

5    *Ass'n v. U.S. Forest Serv.*, 2016 WL 3282047, at *10–13, 14 (D. Mont. June 14,

6    2016) (requiring agency to consider supplementing analyses for outdated AMPs

7    due to reintroduction of bighorn sheep, its designation as a "sensitive species," and

8    new information on disease transmission); *Or. Nat. Desert Ass'n v. Sabo*, 854 F.

9    Supp. 2d 889, 902–10, 923–24 (D. Or. 2012) (finding failure to complete a

10   supplemental NEPA analysis on an AMP violated NEPA) ("*ONDA III*").

11         Here, the Forest Service completed NEPA analyses for the Wenatchee

12   Allotments in 2000 and 2004 before a substantial body of science and other

13   information about the impacts of grazing on bighorn sheep arose. *See* Ex. 30 at

14   165 (stating that the NEPA analyses for the AMPs for the northern allotments were

15   done in 2000, and for the southern allotments in 2004). Since that time, the agency

16   has acquired considerable information about the serious risks and consequences of

17   disease transmission from domestic to bighorn sheep, and developed the Risk of

18   Contact modeling that it uses to analyze risks of grazing consistently across

19   National Forests. *See supra* pp. 3–9, Exs. 1–5, 8–9, 20–21, Besser Decl. ¶¶ 15–40

20   (all illustrating major developments since 2000); *compare* Complaint ¶¶ 29–31,

21

33–37 *with* Answer ¶¶ 29–31, 33–37 (admitting many allegations about this science).  In similar contexts, the agency has found such new information is "significant" and prepared supplemental NEPA analyses for other high-risk allotments.  Ex. 1 at 6; *see also* Exs. 7, 8, 10 (supplemental NEPA examples).

In addition to the wealth of general information about disease transmission that has been developed in the last 20 years, there has been a great deal of new specific information about conflicts between domestic and bighorn sheep in Washington.  Catastrophic disease outbreaks have occurred in several bighorn herds that use habitat on or near the allotments, including one that wiped out the Tieton herd in 2013 and another in late 2020 that is killing bighorns in the Cleman Mountain herd.  Ex. 15 at 5; Ex. 16 at 5; Schommer ¶¶ 26–32, 62.  Both outbreaks were tied to strains of *Movi* carried by domestic sheep.  Besser Decl. ¶¶ 38–39.

Over the last decade, the Tribal Chairman of the Yakama Nation and the Director and Assistant Directors of WDFW have urged the agency to address the serious risks of grazing the allotments and the need to take action to protect bighorns.  Exs. 20, 21. Plaintiffs have also urged the agency to fulfill its duty to analyze and act before it is too late.  Cain Decl. ¶ 10.  In fact, the agency itself admitted *for years* that it must run the Risk of Contact model and prepare a new NEPA analysis for these allotments.  *See* Ex. 17 at 14, Ex. 19, Ex. 22 at 3, Ex. 23 at 13, Ex. 24 at 2–4, Ex. 27 (all recognizing need since 2011); *see* Ex. 25 at 5

1    (modeling "clearly displayed the need" for new NEPA).  When the agency finally

2    ran the model in 2016, the results showed the Wenatchee Allotments in the high-

3    risk category and noted the Cleman Mountain and Tieton herds should be a "top

4    priority" for updating NEPA analyses.  Ex. 23 at 12–13.  Yet it has still not done a

5    new NEPA analysis despite this significant new information, while continuing to

6    authorize grazing on most allotments each year.

7          Given the significance of the new information, the Forest Service's failure to

8    complete a supplemental NEPA analysis for outdated AMPs on the Wenatchee

9    Allotments is unacceptable and unlawful.  NEPA does not allow the agency to turn

10   a blind eye to such information before authorizing grazing each year.  *ONDA III*,

11   854 F. Supp. 2d at 902–10, 923–24; *see also Friends of the Clearwater v.*

12   *Dombeck*, 222 F.3d 552, 558-59 (9th Cir. 2000) (agency failed to evaluate if new

13   information about sensitive species warranted a supplemental NEPA analysis);

14   *Sierra Club v. Bosworth*, 465 F. Supp. 2d 931, 940–41 (N.D. Cal. 2006) (new

15   information about species required supplementation).  Accordingly, Plaintiffs are

16   likely to succeed on the merits of their claim that the agency's failure to

17   supplement the NEPA analyses for the Wenatchee Allotments violates NEPA.

18          2.    *Irreversible and Irretrievable Commitment of Resources.*

19          The Ninth Circuit has held that NEPA prohibits agencies from making any

20   "irreversible and irretrievable commitment of resources" *before* an analysis is

21

1   completed so that the agency does not impair the decision-making process and

2   prejudice consideration of alternative actions.  *Conner v. Burford,* 848 F.2d 1441,

3   1446 (9th Cir. 1988); *Metcalf v. Daley,* 214 F.3d 1135, 1142–43 (9th Cir. 2000);

4   *Anderson v. Evans,* 371 F.3d 475, 501 n.25 (9th Cir. 2004).  Thus, an agency

5   cannot take actions that could irreversibly impair the environment before assessing

6   the impacts of those actions and any reasonable alternatives.  *Connor,* 848 F.2d at

7   1446–1451; *Metcalf,* 214 F.3d at 1143; *Anderson¸* 371 F.3d at 501 n.25.

8       In a similar context, the District of Idaho found that irreversible damage to

9   bighorn sheep was possible pending completion of an EIS, so Plaintiffs were likely

10  to succeed on their NEPA claim.  *WWP IV,* 2009 WL 3335365, at *6.  The court

11  noted that, well before the EIS was completed, bighorns could become infected

12  and pass the infection on to other bighorns, causing "large-scale losses."  *Id.*

13  Likewise, in *ONDA III,* 854 F. Supp. 2d at 922–24, the court held that the agency

14  violated NEPA by authorizing grazing before it completed a supplemental NEPA

15  analysis where grazing was causing harm to sensitive species that could be

16  irreversible.  In line with these cases, agencies have closed a number of grazing

17  allotments that posed a high risk to bighorn sheep pending completion of NEPA

18  analyses to avoid harm in the interim.  *See, e.g.*, Exs. 7, 11, 12 (closures); *WWP I,*

19  2007 WL 3407679, at *1, 4 & *WWP II,* 2007 WL 1729734 (upholding closures).

20      Rather than take similar action here, the Forest Service has continued to

21

authorize grazing on most of the Wenatchee Allotments despite admitting it must complete a new NEPA analysis to assess this new information. *See* Ex. 25 at 5 (modeling "clearly displayed the need" for new NEPA); *see also* Ex. 19 (stating that NEPA would begin in fall 2016), Ex. 23 at 13 (recommending new NEPA in Risk of Contact report). The Forest Service has authorized grazing even though: 1) its own Risk of Contact modeling found the allotments pose a "high risk" of contact to four bighorn herds, Ex. 23 at 11–13; 2) habitat conditions make it easy for bighorns to foray onto allotments or for domestic sheep to stray off the allotments, Leroux Decl. ¶¶ 19–21, Ex. 31, Schommer Decl. ¶¶ 17–23; 3) the permittee has reported stray or lost domestic sheep from the allotments, Ex. 31; 4) core home range for the Cleman Mountain herd overlaps the Nile allotment, Ex. 23 at 11–12; and 5) strong natural attraction between bighorn sheep and domestic sheep leads to comingling and contact when the species are in the same vicinity, Schommer ¶¶ 33–38. These factors demonstrate the high risk of contact from grazing the Wenatchee Allotments. Ex. 23 at 11–13; Schommer Decl. ¶¶ 39–55.

Should such contact occur, disease transmission is likely, which will cause long-lasting and irreversible harm to one or more herds on the Forest. Schommer Decl. ¶¶ 56–64; *see* also Ex. 9 at 9 ("Research results provide strong evidence that bighorn sheep have a high probability of contracting fatal pneumonia following contact with domestic sheep."); Ex. 2 at 10 (explaining that only "population

eradication[] has successfully stopped" disease outbreaks and prevented their spread); Ex. 14 at 20 (explaining the diseased Tieton herd was eradicated to protect the nearby Cleman Mountain herd from a similar fate). The risks of long-lasting and irreversible harm to the Cleman Mountain herd are particularly acute given the disease outbreak unfolding now. Schommer Decl. ¶¶ 62, 64 (opining that further disease in the herd "would lead to long-term harm and possibly its extirpation").

Agencies have relied on similar factors to close allotments "during the time needed to update the NFMA and NEPA analysis." *See, e.g.*, Ex 7 at 3 (reasons for closing allotment); Ex 12 (administrative order upholding BLM closure, finding grazing high-risk allotment would constitute an irreversible and irretrievable commitment of resources that violated NEPA). Failing to take similar action here to prevent irreversible damage to bighorn sheep by prohibiting grazing of high-risk allotments pending new environmental analysis violates NEPA. *See WWP IV*, 2009 WL 3335365, at *6 (finding such a NEPA violation likely).

## II. IRREPARABLE HARM IS LIKELY TO OCCUR TO BIGHORN SHEEP AND THE PLAINTIFFS.

The Ninth Circuit has found that harm is irreparable where it "cannot be remedied easily if at all." *League of Wilderness Defenders/Blue Mountain Biodiversity Project v. Connaughton*, 752 F.3d 755, 764–65 (9th Cir. 2014) ("Connaughton"). Plaintiffs may demonstrate irreparable harm by showing that the challenged decision would harm their members' ability to "view, experience,

1    and utilize" public lands.  *All. for the Wild Rockies*, 632 F.3d at 1135.

2        Here, Plaintiffs and their members have longstanding interests in bighorn

3    sheep within Washington and across the Okanogan-Wenatchee National Forest.

4    Boese Decl. ¶¶ 4–10; Leroux Decl. ¶¶ 14–16.[9]  Bighorn sheep herds on the Forest

5    are experiencing impacts from disease and other factors and have population levels

6    lower than the habitat can support.  Schommer ¶¶ 59, 64.  This means Plaintiffs'

7    members are less likely to view bighorns when they visit and thus likely to enjoy

8    their visits less when they are there.  Boese Decl. ¶¶ 9–13; Leroux Decl. ¶¶ 15–26.

9        Given the ongoing long-term harm to these bighorn populations from

10   repeated disease outbreaks, irreparable harm from domestic sheep grazing is

11   already occurring.  Five of the seven herds in the Wenatchee and Yakima meta-

12   populations have experienced or are currently suffering from die-offs due to

13   pneumonia.  Schommer Decl. ¶ 61 (describing disease events in the Umtanum,

14   Cleman Mountain, Tieton, Manson, and Quilomene herds).  Outbreaks in the

15   Umtanum, Tieton, and Cleman Mountain herds have been tied to domestic sheep.

16   Besser Decl. ¶¶ 38–39.  Once a bighorn herd is infected with *Movi,* the effects of

17   disease persist for years or even decades because surviving ewes transmit the

18   pathogen to their lambs, killing most lambs in the population each year.  *Id.* ¶ 18–

19

20   _____

     [9] These declarations also support Plaintiffs' standing.

21

19, 37; *see also* Ex. 17 at 16 (admitting that recovery "*likely* requires many decades, *if the herd recovers at all*") (emphasis added).  If a new strain of *Movi* is introduced into the herd, it will experience another all-age die-off that could extirpate the herd.  Schommer Decl. ¶¶ 29–31, 62–64; Besser Decl. ¶¶ 28–31, 40.

Such a result is likely if domestic sheep continue to graze the Wenatchee Allotments, as explained by the Forest Service's long-time National Bighorn Sheep Biologist Tim Schommer.  Schommer Decl. ¶¶ 56–64.  According to him and WDFW, the biggest threat to these bighorn sheep herds "is transmission of deadly pathogens from domestic sheep." *Id*. ¶ 61.  Given that there is "very little" spatial separation between domestic sheep on the allotments and those bighorn herds, and a lack of significant barriers to movement by either species, the risk of contact between the species if domestic sheep graze there is high.  *Id*.; Ex. 23 at 11–13.

If such contact happens, even just with one or two domestic sheep, disease is likely to harm individuals and cause die-offs within a herd.  Schommer Decl. ¶¶ 56–57; Ex. 9 at 9.  Die-offs can occur suddenly and rapidly, leading to loss of an entire herd—as happened in 2013 to the Tieton herd.  A disease outbreak in one herd also threatens other herds within the meta-population, given habitat connectivity and short foray distances.  Schommer Decl. ¶¶ 58, 62.  The agency even admits that, "if one herd becomes infected, there is a high likelihood that disease will spread, infect multiple herds, and cause catastrophic die-offs to a

substantial number of bighorns in the National Forest and the state."  *Compare*

Complaint ¶ 73, *with* Answer ¶ 73.  Such risks are acute for the Swakane and

Cleman Mountain herds, and the introduction of another *Movi* strain into the

Cleman Mountain herd "would likely eliminate most or all its members", making

the risks from the southern allotments especially severe.  Schommer Decl. ¶ 62.

In sum, bighorn sheep herds in the two meta-populations on the Forest "are

at unacceptable risk from further impacts of disease" and the only way to prevent

irreparable harm from continuing is to prohibit domestic sheep grazing on the

Wenatchee Allotments.  *Id.* ¶ 64.  Given the risk of catastrophic impacts if grazing

occurs on the high-risk allotments, the Court should find a likelihood of irreparable

harm here.  *See WWP III*, 2017 WL 5571574, at *13–14 & *WWP IV*, 2009 WL

3335365, at *5–6 (finding a likelihood of irreparable harm in similar situations).

## III. THE EQUITIES TIP SHARPLY IN FAVOR OF AN INJUNCTION TO PROTECT BIGHORN SHEEP.

Finally, the Court must balance the hardships between parties and consider

the public interest when deciding whether to issue an injunction.  *Connaughton*,

752 F.3d at 765-67.  The public interest is a critical component of this equation.

*All. for the Wild Rockies,* 632 F.3d at 1138–39.  The balance of hardships and

public interest strongly weigh in favor of enjoining grazing here.

The public has a great interest in preserving bighorn sheep, an iconic

Western species within Washington state that sovereigns and many people value,

1 including hunters, recreationists, and wildlife enthusiasts. *See generally* Ex. 21

2 (Yakama Nation); Ex. 22 (WDFW); Leroux, Cain, and Boese Decls (Plaintiffs and

3 their members); Ex. 15 at 8 (hunters). Disease transmission that results in

4 outbreaks and die-offs in just one of the four bighorn sheep herds at high risk

5 would be devastating. But an outbreak in one herd that spreads throughout a meta-

6 population would be an incalculable loss, setting back reintroduction efforts.

7        In contrast to the threat of widespread public harm if grazing occurs, the

8 requested injunction may force one permittee to incur additional costs,  ECF No.

9 10 ¶ 10, but would not prohibit domestic sheep grazing on two other allotments nor

10 cattle grazing on the Naches allotment as occurred in past years. Ex. 30. In similar

11 situations, courts have found that such economic impacts do not outweigh the

12 public interest in protecting wildlife. *See WWP IV*, 2017 WL 5571574, at *14

13 (ruling that the balance clearly tipped in favor of preserving the "significant"

14 public interest in a "sensitive, iconic species such as bighorn sheep").

15        For these reasons, the Court should find that preventing domestic sheep on

16 the Wenatchee Allotments from causing catastrophic harm to bighorn sheep herds

17 on the National Forest warrants an injunction.

18                                            **CONCLUSION**

19        Plaintiffs respectfully request that the Court grant their Motion and enjoin

20 use of the Wenatchee Allotments pending completion of this case.

21

1    DATED this 26th day of February, 2021.

2
                                    Respectfully submitted,
3
                                    /s/Elizabeth H. Potter
4                                   Elizabeth H. Potter (WSB # 44988)
                                    Lauren M. Rule (OSB #015174) *pro hac vice*
5                                   ADVOCATES FOR THE WEST
                                    3701 SE Milwaukie Ave. Ste. B
6                                   Portland, OR 97202
                                    (503) 914-6388
7                                   epotter@advocateswest.org
                                    lrule@advocateswest.org
8
                                    *Attorneys for Plaintiffs*
9

10

11

12

13

14

15

16

17

18

19

20

21

MOTION FOR PRELIMINARY INJUNCTION MEMORANDUM          41